### JOHN W. WILLIAMS v. THE STATE.

#### No. 1758.   Decided May 15, 1912.

#### Rehearing denied June 26, 1912.

**1.—Murder—Evidence—Credibility of Witness.**

Where, upon trial of murder, the evidence showed that a State's witness felt a deep interest in the case and was perhaps a biased witness, there was no error in asking said witness whether defendant had ever asked him to handle cattle belonging to his principal, to which he answered in the negative.

**2.—Same—Evidence—Threats—Character of Deceased.**

Where the defendant had shown threats of deceased and that he was the character of man who would be likely to execute a threat when seriously made, there was no error in admitting testimony that the State's witness had known deceased intimately and had never known him to carry a pistol.

**3.—Same—Evidence—Motive.**

Upon trial of murder, there was no error in admitting evidence that a herd of cattle that had belonged to defendant was driven inside of a certain pasture, and that deceased stopped the same but when told that they belonged to another permitted him to water them, etc.; the trouble growing out of this matter and showing the motives of the parties in the events that happened subsequently to the conversation between defendant and deceased at that time.

**4.—Same—Evidence—Acts and Declarations of Defendant.**

Upon trial of murder, there was no error in introducing testimony that immediately after the conversation between the defendant and deceased, about certain cattle, the defendant rode home and saw his wife and brother, and that his wife told him where to get the gun and that they all three went to the depot where the homicide occurred; and also the declaration which he made about that time.

**5.—Same—Evidence—Conclusion of Witness.**

Where, upon trial of murder, it was shown that just before the homicide defendant's brother and the deceased were fighting with ropes, there was no error in permitting a State's witness to testify that defendant's brother got the best of the fight; there being no injury shown to defendant.

**6.—Same—Evidence—Irrelevant Matter.**

Upon trial of murder, there was no error in refusing to permit it to be shown that a witness in marrying the second time had married a woman of questionable virtue.

**7.—Same—Evidence—Threats.**

Upon trial of murder, there was no error in admitting testimony as to a threat made by defendant against the deceased.

**8.—Same—Evidence—Threats.**

Upon trial of murder, where defendant had testified to communicated threats by deceased against him, and the parties who so told him had not testified, there was no error in permitting the State to show that defendant knew that deceased did not associate with these men and that he would not likely have made the threats to them.

**9.—Same—Evidence—Reputation—Truth and Veracity.**

Where the State had not offered to impeach the defendant, there was no error in excluding testimony to prove defendant's reputation for truth and veracity.

**10.—Same—Remarks by Judge.**

Upon trial of murder, where the remarks made by the judge during colloquies between himself and the defendant's counsel were not made upon the weight of the testimony and did not indicate to the jury the court's opinion of the merits of the case, there was no reversible error; however, the court should never permit himself to be drawn into a discussion of this character.

**11.—Same—Remarks by Judge—Practice.**

Where it was not shown that the remarks of the court were such that they could have influenced the verdict of the jury in ruling on certain remarks made there by State's counsel to the effect that the jury should not consider them it was not necessary to again instruct them thereon, there was no error; besides the bill of exceptions was defective.

**12.—Same—Evidence—Impeachment.**

Where a State's witness denied making a certain statement, and defendant introduced a witness that such a statement was made by said witness, there was no error in permitting the State to introduce the testimony of said witness at the examining trial to support his testimony in the trial; besides the bill of exceptions was defective.

**13.—Same—Evidence—Conclusion of Witness.**

Where the question did not call for a conclusion of the witness with reference to the position of the parties at the time of the homicide, there was no error.

**14.—Same—Remark by State's Counsel.**

While the remark of State's counsel to the effect that defendant's brother, who was on the stand, was an extraordinary man, was improper, yet it was not reversible error.

**15.—Same—Continuance—Remarks of Counsel.**

In the absence of a bill of exceptions to the overruling of an application for a continuance or to the remarks of the State's counsel, the same can not be considered on appeal.

**16.—Same—Charge of Court—Murder in Second Degree.**

Where defendant has been acquitted at a former trial of murder in the first degree and the court's charge left the question for the jury to determine whether the evidence showed either express or implied malice and that they could not convict except for murder in the second degree, there was no error.

**17.—Same—Charge of Court—Manslaughter—Charge as a Whole.**

Where, upon trial of murder, the court's charge on manslaughter with reference to the provocation was not conflicting, when read as a whole, there was no error.

**18.—Same—Charge of Court—Provocation.**

Where the court instructed the jury that it was their duty to determine the adequacy of the provocation, instead of the adequacy of the cause of defendant's passion, a criticism thereto is hypercritical.

**19.—Same—Charge of Court—Enumerating Facts.**

Where the court's charge on manslaughter sufficiently grouped the facts in evidence, and instructed the jury that they must consider all the facts and circumstances in the case in passing on the issue of manslaughter, there was no error.

**20.—Same—Charge of Court—Cooling Time.**

Where, upon trial of murder, the evidence called for a charge on cooling time, which the court gave, there was no error.

**21.—Same—Charge of Court—Adequate Cause.**

Where, upon trial of murder, the court's charge in defining adequate cause when read in connection with the whole charge was not confusing or misleading, there was no error.

**22.—Same—Charge of Court—Words and Phrases.**

Where the court in his charge on manslaughter used the words "bear in mind the foregoing definitions, etc.," the same was not confusing or misleading.

**23.—Same—Charge of Court—Self-Defense—Words and Phrases.**

Where, upon trial of murder, the court in his charge on self-defense used the words "imminent and pressing danger" there was no error under the evidence of the case, the court instructing the jury that they must view the case from the standpoint of the defendant; neither was there error to place the right of self-defense upon necessity or apparent necessity.

**24.—Same—Charge of Court—Threat.**

Where, upon trial of murder, the evidence showed threats by deceased against the defendant, and the court instructed the jury that if they believed from the evidence that threats had been made by deceased to take the life of the defendant and that defendant honestly believed the information of such threats, and that deceased by some act then done, word spoken or demonstration made manifest an intention to execute the threats, defendant would have the right to kill and to acquit in that event, there was no error. Distinguishing Tillery v. State, 24 Texas Crim. App., 271.

**25.—Same—Charge of Court—Evidence—Special Charges.**

While perhaps there are some verbal inaccuracies in the charge of the court, and the court made remarks to counsel which he should not have made, yet taking the case as a whole no illegal evidence was admitted and the charge of the court as a whole correctly submitted the law on the issues, there was no error; and the complaint that the special charges were refused presents no error.

**26.—Same—Evidence—Impeachment.**

Where the effort was made to prove that the testimony was a fabrication, there was no error in permitting the State to show that this testimony was given at a time when such motives did not exist with the witness. Following Jones v. State, 38 Texas Crim. Rep., 103.

**27.—Same—Evidence—Husband and Wife.**

Where the State did not offer the wife of defendant as a witness, but simply showed by other testimony that she had told the defendant where to get the gun

and that she and defendant's brother rode direct to the place where the deceased was and the difficulty occurred in which the latter was killed by defendant, showing a preconceived killing, there was no error. Following Smith v. State, 48 Texas Crim. Rep., 235.

#### 28.—Same—Evidence—Motive.

Upon trial of murder, there was no error in showing that certain cattle held by the defendant at a certain pasture were watered at a lake over the objections of the deceased; the evidence showing that the whole trouble between defendant and deceased grew out of matters connected with a certain cattle range, etc.

Appeal from the District Court of Porter. Tried below before the Hon. J. N. Browning.

Appeal from a conviction of murder in second degree; penalty, nine years imprisonment in the penitentiary.

The opinion states the case.

*Cooper, Merrill & Lumpkin, W. W. Gatewood* and *Knight & Slaton,* for appellant.—On the question of admitting testimony as to whether cattle were afterwards watered at the lake: Feinstein v. State, 73 S. W. Rep., 1052; Young v. State, 69 S. W. Rep., 154; Holmes v. State, 106 S. W. Rep., 1160.

On question of admitting testimony showing where the wife of defendant was: Bluman v. State, 33 Texas Crim. Rep., 43; Majors v. State, 58 Texas Crim. Rep., 39; Wade v. State, 48 Texas Crim. Rep., 512; Suggs v. State, 46 id., 151; Ray v. State, 64 S. W. Rep., 1057.

On question of impeaching witness: Holmes v. State, 106 S. W. Rep., 1160; Doucette v. State, 45 S. W. Rep., 800; Red v. State, 46 S. W. Rep., 408; Standford v. State, 29 S. W. Rep., 221; Scott v. State, 47 S. W. Rep., 531.

On question of the court's charge conveying the impression that the court believed defendant guilty: Moore v. State, 33 Texas Crim. Rep., 306; Kirk v. State, 35 id., 224; Wilson v. State, 17 Texas Crim. App., 526; McCullar v. State, 36 Texas Crim. Rep., 213; Manning v. State, 37 id., 180; Harrell v. State, 39 id., 225; Lundy v. State, 59 Texas Crim. Rep., 132.

On question of the court's charge on threats and self-defense: Burnam v. State, 61 Texas Crim. Rep., 55; Lundy v. State, 59 id., 132; Lockhart v. State, 53 id., 594; Swain v. State, 48 id., 102; Miles v. State, 18 Texas Crim. App., 171; Bonner v. State, 29 Texas Crim. App., 232.

On question of the court's charge on manslaughter: Fuller v. State, 54 Texas Crim. Rep., 454; Gallagher v. State, 115 S. W. Rep., 47; Craft v. State, 122 S. W. Rep., 547.

On question of court's charge on provocation: McHenry v. State, 54 Texas Crim. Rep., 480.

*C. E. Lane,* Assistant Attorney-General, *Cowan & Burney* and *W. D. Berry,* for the State.—On question of the court's charge on self-

defense: Perkins v. State, 144 S. W. Rep., 244; Ryan v. State, 142 S. W. Rep., 883.

On question of the court's charge in using the words "imminent and pressing:" Bush v. State, 51 S. W. Rep., 238.

On question of impeachment of witness: Streight v. State, 62 Texas Crim. Rep., 453, 138 S. W. Rep., 742; Goode v. State, 57 Texas Crim. Rep., 220, 123 S. W. Rep., 606, and cases cited in the opinion.

HARPER, JUDGE.—This is the second appeal in this case, the opinion on the former appeal being found in 61 Texas Crim. Rep., 356, 136 S. W. Rep., 771. When tried appellant was again found guilty of murder in the second degree and his punishment this time assessed at nine years confinement in the penitentiary.

The evidence is very fully stated in the opinion on the former appeal in this case, and we will only state such as may be necessary to render our opinion intelligible in passing on the various bills of exception in the record.

1. The first five bills relate to testimony of the witness H. S. Boice. The testimony of this witness shows that he was the superintendent for the Capitol syndicate and deceased was manager of the ranch at Bovina. Mr. Boice was asked if he knew whether or not appellant had ever asked permission to handle cattle in the pastures belonging to the Capitol syndicate, to which question he answered: "No, sir." Under the testimony we think the question permissible, but if it had not been it would present no error, for the witness answers he did not know. The witness Boice had answered, on cross-examination by appellant, that he felt a deep interest in the case, and that perhaps he might be termed a biased witness. On redirect examination he was permitted to state that he would not permit his bias, nor state of his feelings to color his testimony, nor deviate from the facts. The defendant having shown the bias, state of feeling, and ill will of the witness for the purpose of affecting his credit as a witness, we think it was permissible for the State in rebuttal to elicit the character of testimony shown by this bill.

This witness was also permitted to state that he had known Armstrong (deceased) a number of years, and had been intimately associated with him, and had never known him to carry a pistol. The defendant had shown threats of deceased, had introduced witnesses to prove that deceased was the character of man who would be likely to execute a threat when seriously made, and in this condition of the record we do not think it was error to permit a witness to state that he was a man who did not carry arms. If he had been one who habitually carried arms, in connection with the testimony of threats, of that character of man who would execute the threats, it certainly would have been permissible to have proven that fact, and on the other hand, the fact that he did not do so would also be admissible, when

evidence of threats, etc., were introduced in evidence. The other bills to testimony of this witness likewise present no error.

2. In the record it is shown that a herd of cattle that had belonged to appellant were driven inside of what is known as the lake pasture to water. Deceased seeing the gate opened and cattle driven in, rode over there and stopped the cattle. Mr. Jersig, who had worked for the Capitol syndicate, informed deceased he had bought the cattle, when he permitted him to water them. Appellant had another herd, holding them just outside of this pasture, and Mr. Jersig was permitted to testify that subsequently these other cattle were also driven inside and watered at this lake. Inasmuch as the trouble apparently grew out of troubles existing between appellant and the Capitol syndicate, or its employes, and that deceased went from Mr. Jersig to where appellant was holding the other cattle, and had a conversation with him, and that the killing shortly thereafter followed, it was not error to permit it to be shown that these cattle were subsequently watered at the lake, as it tended to show whether or not they were being held there for that purpose, and would aid the jury in passing on the acts and motives of the parties in the events that happened subsequent to the conversation between appellant and deceased.

3. It appears that appellant, after the conversation with deceased near the lake pasture, galloped his horse to his home, about a quarter of a mile distant, got down and went in the house; that on coming out of the house he met his brother, Doby Williams, whom he told, in answer to a question, "Don't bother me; Jno. Armstrong, deceased, has been around here whipping me with a rope, and threatened to kill me," and then told him to go to the depot to order some cars, so Doby says. Appellant is then shown to have gone to Tom Riley's house and got his Winchester rifle, his wife having told him that Dan Riley had borrowed it. When deceased and appellant parted at the lake pasture, appellant going after his gun, deceased went to the depot at Bovina. Doby Williams, after seeing his brother, also went to the depot, and he and deceased got into a fight, using their ropes. Appellant rode up and shot deceased. At the time of and just after the shooting it was shown by witness McDonald that appellant's wife was standing where she could see the entire difficulty. It was not undertaken to prove what she said, if she said anything, but only that he could be seen at this point. The State was endeavoring to prove that appellant, after the transaction at the lake pasture, had rode directly home, saw his wife and his brother, and his wife had told him where to get the gun; that appellant's brother had gone to the depot, where they apparently knew deceased had gone, got into trouble with him, when appellant came up and shot deceased. The State's theory was that it was a preconceived killing, and the acts and conduct of the parties under these circumstances would be admissible, and it was not error to admit testimony of the position

of Mrs. Williams after it was shown that appellant had gone home and asked for his gun, and rode off with it. It would be a circumstance as tending to show whether or not appellant at that time had formed the determination to kill. Neither was there any error in permitting witnesses to state what was said by defendant at the time he went to Riley's and got his rifle.

4. Witness Weaver in detailing the rope fight between deceased and Doby Williams said, among other things, "Doby got the best of the fight." This was objected to on the ground that it was a conclusion of the witness. Perhaps the remark was not called for by the question asked, yet we fail to see in what way it could have been injurious to appellant for the witness to have interpolated that remark in detailing the rope fight.

5. It was not error to refuse to permit it to be shown that a witness in marrying the second time, had married a woman of questionable virtue. This is not a proper way to attack the credit of a witness—as to the conduct of his wife or other relatives.

6. The testimony of the witness Canfield as to a threat made by appellant was held to be admissible on the former appeal in this case, and we do not care to discuss it again. By reading that opinion the reason for its admissibility is clearly made manifest.

7. Appellant, on cross-examination, had testified to threats of deceased being communicated to him by Bryant, Elliott, Claunch and a number of others. These men were not placed on the witness stand, but appellant testified in his own behalf, and testified to the threats being communicated to him by them. On cross-examination of defendant, counsel for the State sought to develop that defendant knew that deceased did not associate with these men, and their relations were such that deceased would not likely have made the threat to them; that they were men of a character in whom one would not ordinarily place any reliance in their statements. If the witnesses themselves had been placed on the stand, when they testified to deceased communicating threats to them against appellant, it would have been permissible to show whether or not they were acquainted with deceased; the extent of their association; that they were in jail charged with crime or other facts legitimately affecting their credit as a witness, and when defendant did not place them on the stand, but testified to them communicating the threats to him, it was permissible to develop his knowledge as to these facts, if facts they be, that the jury might determine whether in fact he placed reliance in the threats communicated by them to him.

8. In a bill of exception it is shown that defendant tendered a number of witnesses to prove that his reputation for truth and veracity was good. As the State had not offered to impeach the defendant by proving contradictory statements or otherwise, the court did not err in excluding the testimony. The court permitted the defendant to

prove that his reputation as a peaceable, law-abiding citizen was good by all witnesses offered for that purpose.

9. A number of bills of exception were reserved to remarks made by the court during colloquies between appellant's counsel and the court, and between State's counsel and the court. The court should never permit himself to be drawn into a discussion of his rulings either with the State or defendant's counsel, and some of the remarks made were perhaps improper, but as no remark made by the court would be upon the weight of the testimony, nor indicate to the jury his opinion of the merits of the case; they could not have been prejudicial to defendant's rights, and, therefore, do not present reversible error. However, we hope the trial courts will cease permitting themselves to be drawn into controversies with counsel trying a case, but merely rule on the objections made, and thus prevent these questions being unnecessarily brought in issue in the case on appeal.

10. In bill No. 20 we can not tell what evidence went to the jury, as it appears the court sustained the defendant's objection to the indictment being introduced in evidence. The bill seems to be to a remark of the court. When defendant's counsel asked the court to instruct the jury not to consider what State's counsel had said about the indictment, the court replied: "They have been instructed. They are men of ordinary intelligence and they don't have to be told every minute. When counsel addresses the court it is not evidence." If the court had instructed the jury not to consider evidence excluded by the court, it was perhaps not necessary to again instruct them. However, counsel and the court both seem at times to have been a little bit petulant, which is to be regretted, yet in the absence of any showing that anything was said or done that could have influenced the verdict of the jury, it does not present error. If the bill is to be taken as an objection to the question of whether or not he had ever before been indicted, inasmuch as defendant answered that he did not know it if he had, as no papers had ever been served on him, this would not present error. As before stated, we can not say by the bill whether or not any evidence was permitted to go before the jury under the recitations in this bill, and therefore it does not present error.

11. While the witness Weaver was testifying, on cross-examination, he was asked by defendant if he had not stated in the presence of John Aldredge and others that the next time he testified in this case he was going to swear enough to break John Williams' neck. Witness denied making the statement, when Aldredge was introduced by defendant and testified Weaver did make such statement, and had said that he was running a dray at Bovina, and appellant had put in a dray, competing with him. The State then offered the evidence of Weaver at the examining trial held a few days after the killing. In admitting this testimony there was no error, as the defendant had sought to impeach the testimony of the witness Weaver, and show

that his testimony on this trial was manufactured. When one seeks to impeach a witness, then his statements made at the time of or shortly after the occurrence are admissible to support his testimony in the trial, if it does do so. However, the bill does not show that the testimony was introduced, merely showing that "counsel offered the testimony," which was objected to.

12. Dobie Williams having testified that deceased was facing defendant at the time he was shot, on cross-examination, counsel for the State asked him: "If the shot did go in through the right sleeve of the coat, under the armpit and come out under the shoulder blade, on the left side, the wound ranging backward, how could it have done that if Mr. Armstrong was facing him?" This was objected to, and the objection overruled. The witness answered: "It seems to me he was facing him when the gun fired." The question did not call for a conclusion of the witness, but he could have stated any fact, or circumstance, such as deceased suddenly wheeled, or any other fact that was true in explanation of his statement.

13. The remark of counsel for the State to Dobie Williams when on the witness stand: "You are an extraordinary man," should not have been made, but as it did not tend to show appellant's guilt or innocence, it does not present reversible error.

14. There are a great number of bills of exception in the record, and we have attempted to review each of them, but there is no bill reserved to the action of the court in overruling the application for a continuance. This matter is not presented in a way we can review it. Neither can we review those grounds in the motion for a new trial complaining of remarks of State's counsel. No bills of exception were reserved, and we are not shown what language it was that was objected to.

15. The second paragraph of the court's charge does not charge the jury that the evidence established express malice. It leaves the question for the jury to determine whether it shows either express or implied malice, informing them that if the evidence shows express malice, it would warrant a conviction for murder in the second degree, as express malice includes implied malice. This was not upon the weight of the evidence, and as defendant was on trial for no higher grade of offense than murder in the second degree, the assignment presents no error.

16. On manslaughter the court charged the jury: "5. Manslaughter · is voluntary homicide, committed under the immediate influence of sudden passion, arising from an adequate cause, but neither justified nor excused by law.

"6. By the expression 'under the immediate influence of sudden passion' is meant: (a) that the provocation must arise at the time of the commission of the offense, and that the passion is not the result of a former provocation; (b) the act must be directly caused by the passion arising out of the provocation. It is not enough that the

mind is merely agitated by the passion arising from some other provocation or a provocation given by some other than the party killed. (c) The passion intended is either the emotion of the mind known as anger, rage, sudden resentment or terror, rendering it incapable of cool reflection.

"7. By the expression 'adequate cause' is meant such as would commonly produce a degree of anger, rage, sudden resentment or terror, in a person of ordinary temper, sufficient to render the mind incapable of cool reflection.

"8. Any condition or circumstance which is capable of creating and does create sudden passion, such as anger, rage, sudden resentment or terror, rendering the mind incapable of cool reflection, is in law adequate cause. And where there are several causes to arouse passion and no one of them alone would constitute adequate cause, it is for you to determine whether or not all such causes combined might be sufficient to do so.

"9. In order to reduce a voluntary homicide to the grade of manslaughter, it is necessary not only that adequate cause existed to produce the state of mind referred to, that is, anger, rage, sudden resentment or terror, sufficient to render the mind of a person of ordinary temper incapable of cool reflection, but also that such state of mind did actually exist at the time of the commission of the offense.

"10. Although the law provides that the provocation causing the sudden passion must arise at the time of the killing, it is your duty in determining the adequacy of the provocation, to consider in connection therewith, all the facts and circumstances in evidence in the case; and if you find that by reason thereof the defendant's mind, at the time of the killing, was incapable of cool reflection and that said facts and circumstances were sufficient to produce that state of mind in a person of ordinary temper, then the proof as to the sufficiency of the provocation satisfies the requirements of the law. And so, in this case, you will consider all the facts and circumstances in evidence in determining the condition of the defendant's mind at the time of the killing and the adequacy of the cause, producing such condition.

"11. If you find from the evidence in this case that a short time before the killing took place the defendant and the deceased had engaged in an altercation in which the deceased made demonstrations toward the defendant and threatened his life, taking into consideration their former relations to each other, and what had passed between them, if anything, and the acts and words of deceased at that time and before, if any, if you find such facts, or any one or more of them, were sufficient to produce in the mind of a person of ordinary temper such a degree of anger, rage, resentment or terror as to render him incapable of cool reflection at that time, and did produce in the mind of defendant such passion, and before he had time for such passion to subside and reason to resume its sway before the

killing occurred, then, if you so find, the same would be deemed adequate cause; or, if you find that time sufficient had elapsed for the passion to subside and reason to resume its sway, yet, if you find from the evidence that when the defendant and deceased met again, at the time of the killing, the deceased, by any act or word of his at such time, which were of themselves sufficient, or if taken into consideration with his former acts or words, would be sufficient to produce in the mind of defendant such a degree of anger, rage, sudden resentment or terror as to render him incapable of cool reflection at that time, and did produce in the mind of defendant such passion, the same would be deemed adequate cause.

"12. When a voluntary homicide takes place under the immediate influence of sudden passion and no cause is shown to exist which will, under the law, excuse or justify the commission thereof, then, in order to determine whether such homicide is murder in the second degree or manslaughter, the test is, was there adequate cause? If adequate cause existed, then the killing would be manslaughter.

"13. Bearing in mind the foregoing definitions and instructions relative to manslaughter, sudden passion and adequate cause, if you believe from the evidence, beyond a reasonable doubt, that the defendant, John W. Williams, in the county of Parmer, and State of Texas, on or about the 17th day of November, 1908, did then and there, unlawfully, while under the immediate influence of sudden passion, arising from an adequate cause, but neither excused nor justified by law, with a gun shoot and kill John Armstrong, you will find him guilty of manslaughter and assess his punishment at confinement in the penitentiary for any term of years you may agree upon, not less, however, than two years nor more than five years, and so say by your verdict."

The first complaint of this charge is that in paragraph six the court instructed the jury that the provocation must arise at the time of the killing, while in paragraph eight a different criterion is given. If the charge is read as a whole, and especially that portion applying the law to the case, it will be seen that it is not conflicting.

The next complaint is that in paragraph ten the court instructs the jury it was their duty to determine the adequacy of the "provocation" instead of the adequacy of the cause of defendant's passion. This criticism is hypercritical—the provocation would be and necessarily must be the cause of the passion. Mr. Webster defines provocation as the act of provoking or causing vexation or anger; the cause of resentment.

In the fourteenth ground it is said that the court erred in enumerating in paragraph eleven certain facts, and in not enumerating all the facts throwing light on the subject. The defendant testified that he was holding cattle against the fence, when deceased loped up to him and said: "What are you doing here?" when he replied: "Trying to hold these cattle." That deceased then remarked: "It

seems to me you are trying to run things," when he replied he was not. Deceased then said: "Don't commence any of your lies; I know where you have been and what you are doing," and began to take his rope loose from his saddle. Defendant says he then told deceased that he did not want any trouble, that he was not able to fight, when deceased said: "No, but you are going to have it to do," and began striking at him with the rope, with a loop on it. That he was satisfied deceased was trying to rope him, and he jerked his horse back, and again remarked that he was not able to fight, when deceased said: "You had better get able, I will kill you today." Appellant says he broke and run, and ran to his house to get his gun. That his gun was not at home, and his wife told him that Dan Riley had gotten it. That he went to Riley's to get his gun to protect himself. That he got his gun and started back to the cattle, when he saw deceased and his brother Dobie fighting. That he saw his brother ride off and deceased pursuing him, and that when deceased caught up with his brother it looked to him like deceased was trying to rope his brother. That as he rode up deceased turned to him and said, "Oh, you son-of-a-bitch," when he raised his gun and shot him. The court's charge, we think, sufficiently grouped these facts as thus presented, and especially so in view of the fact that the court instructed the jury that it was their duty to consider all the facts and circumstances in the case in passing on the issue of manslaughter.

The next complaint is that in this paragraph the court erred in charging on cooling time, as the facts in the case did not call for such charge. As presented in this paragraph, we do not think the court erred in the respect complained of. The evidence shows that from the time appellant says the first altercation took place he rode a quarter of a mile to his home; went in the house, inquired for his gun, and then went to a neighbor's and secured it, in the meantime telling his brother to go to the depot and order some cars; that Riley's place where he got the gun was some 300 or 400 yards from the place where the killing occurred. Under these circumstances the charge is not subject to the criticism made.

The complaint that paragraph twelve is confusing and misleading is not well founded. After previously defining adequate cause, and when read in connection with the whole charge, this paragraph correctly presents the law.

The complaint to paragraph thirteen is not well founded. The court in telling the jury to "bear in mind the foregoing definitions and instructions relative to manslaughter, sudden passion and adequate cause" would not confuse or mislead the jury.

17. On self-defense the court instructed the jury: "15. Homicide is permitted by law when the party assailed is in imminent and pressing danger of losing his life, or suffering serious bodily injury, whether the homicide be committed by the party about to be slain or seriously injured, or by some party in his behalf, and the same rules

which regulate the conduct of the person about to be injured in repelling the aggression are also applicable to the conduct of him who interferes in behalf of such person. A reasonable apprehension of death or serious bodily injury will excuse a person in using all necessary force to defend his life or person, and it is not necessary that there should be actual danger, provided he acted upon a reasonable apprehension of danger as it appeared to him from his standpoint, at the time and in such case the person acting under such real or apparent danger is in no event bound to retreat in order to avoid the necessity of killing his assailant. The right of self-defense depends upon the necessity or apparent necessity to take life in order to prevent death or serious bodily injury, and when the necessity or apparent necessity to do so, viewed from the standpoint of the person exercising such right, ceases, the right ceases.

"16. Now, if you believe from the evidence that the defendant shot and killed John Armstrong, but further believe that at the time he did so the deceased was making an unlawful and violent attack upon defendant's brother, Doby Williams, which then reasonably appeared to defendant that the said Doby Williams was in danger of losing his life or suffering serious bodily injury at the hands of the deceased, and that his said brother's danger was then imminent and pressing, viewing the whole matter from the defendant's standpoint alone, and, under such circumstances, he shot and killed the said Armstrong, he would be justifiable; or, if you believe from the evidence that from the acts and words of the deceased, at the time, that the defendant had reasonable apprehension that the deceased was about to inflict death or serious bodily injury upon his brother, Doby Williams, and that such danger, or apparent danger, was imminent and pressing, even though there was no real danger, but was only apparent, viewing the matter from the defendant's standpoint alone, at the time, and, to save his brother from such apparent danger to his life or person, the defendant shot and killed the deceased he would be justifiable, and in either or both events, if you so believe from the evidence, you will acquit.

"17. Again, if you believe from the evidence that the defendant shot and killed John Armstrong, but further believe that at the time he did so the deceased was making or about to make an unlawful and violent attack upon him, the defendant, which then reasonably appeared to him that he was in danger of losing his life or of suffering serious bodily injury, at the hands of the deceased, viewing the whole matter from the defendant's standpoint alone, and, under such circumstances, he shot and killed the said Armstrong, he would be justifiable; or, if you believe from the evidence that from the acts and words of the deceased, at the time, that the defendant had a reasonable apprehension that the deceased was about to inflict death or serious bodily injury upon him, and such danger, or apparent danger, was imminent and pressing, even though there was no real danger,

but was only apparent, viewing the matter from the defendant's standpoint alone, at the time, and under such circumstances to save himself from such apparent danger to his life or person, he shot and killed the deceased, he would be justifiable, and in either or both events, if you so believe from the evidence, you will acquit the defendant."

Appellant complains that in presenting the right of defendant to kill in defense of his brother, that the court used the words "imminent and pressing danger," and gave him the right to act in defense of his brother only in the event that the danger to his brother was imminent and pressing, or it so reasonably appeared to him. In the case of Weaver v. State, 19 Texas Crim. App., 569, Judge White, in laying down the rules applicable to the law of self-defense, says: "To justify homicide in defense of one's own life or the life of another, it must be in necessary resistance to aggression apparently violent, *pressing and imminent* towards the person about to be injured." In that case the right of self-defense is discussed at length, and the rules clearly enunciated. This question is also fully discussed by Presiding Judge Davidson in the case of Bush v. State, 51 S. W. Rep., 239, and it is held that as applicable to the evidence in that case the use of the words "imminent and pressing" was not error. We think when one undertakes to justify taking human life on the ground that he thought another was in danger, it is not error for the court to instruct the jury that such danger must be imminent and pressing. While perhaps as a general rule it would be better not to include those words in a charge, yet in a case where the evidence develops the character herein shown, if used, it would not be error.

It was not error for the court to place the right of defense upon necessity or apparent necessity, and the words as used would not tend "to obscure and confuse" the issue of self-defense as made by the evidence. We have given above the evidence of defendant as presenting the issue of self-defense. The State's testimony would have deceased and Doby Williams engaged in a rope fight, striking each other with their ropes, and with no apparent intention to rope one another. While this was taking place appellant rode up and a bystander exclaims: "Look out for the gun." Deceased looked and turned his horse and started to ride off, when appellant shot him in the side. Taking the theories of the State and the defendant, we think the charge on self-defense fairly presented the issues, and the numerous criticisms of the various words in the charge present no error. While it is true that the law gives one the right to shoot in self-defense when "from the acts, or by words coupled with the acts," it reasonably appears to him that the danger is imminent, yet every case must be decided upon the facts in that case, and when the evidence tendered in behalf of defendant embraces both acts and words, a charge that thus presents the case is not erroneous. The court plainly tells the jury that they must view the case as it appeared to

defendant, and the criticism of this part of the charge has no founda-
tion in the charge, for it does not present it as viewed by the jury
at the time of trial, but as it appeared to appellant at the time of the
homicide.

18. On threats the court charged the jury: "18. Where a defend-
ant, accused of murder, seeks to justify himself on the ground of
threats against his own life, he is permitted to introduce evidence of
the threats made, but the same can not be regarded as affording a
justification for the killing, unless it be shown that at the time of
the homicide the person killed, by some act, then done, manifested
an intention to execute the threats so made; and the same rule would
apply where others had communicated to˜ the accused a threat or
threats purporting to have been made by the deceased, provided the
accused believed them to be true and believed that deceased made
them, even though you may believe no such supposed threats had in
fact been made. Now, if you believe from the evidence that the de-
ceased had made a threat or threats against the life of the defendant,
or that other persons had communicated to defendant a threat or
threats purporting to have been made by deceased, against defendant's
life, prior to the killing, and that such threats, or purported threats,
had been communicated to defendant before the homicide was com-
mitted, and the defendant honestly believed such information of
threats to be true, and you further believe from the evidence that at
the time of the killing the deceased, by some act then done, word
spoken or made some demonstration manifesting an intention to ex-
ecute the threats, or purported threats, so made, which act, word or
demonstration reasonably appeared to the defendant, viewed from his
standpoint alone, that the threats were about to be executed, and that
his life was then in danger, or his person of serious bodily injury,
then and in such case the defendant was not bound to retreat, but
could stand his ground and would be justified in slaying the said
Armstrong, and if you so believe from the evidence you will acquit
the defendant."

The defendant testified to a threat being made to him personally,
and to threats being communicated to him by others, and it was
proper for the court to present the issue from both viewpoints. While
there is a number of criticisms of this paragraph of the charge, such
as the "court erred in submitting to the jury the issue of whether
threats had been made or not;" "the court erred in requiring the jury
to believe that at the time of the killing there must have been some
act done, word spoken or demonstration made;" "that defendant must
believe his life was in danger, as well as believe that the threats were
about to be executed;" and that the defendant must have "honestly"
believed that the threats had been made, etc. We do not deem it
necessary to discuss each separately. This, as every other paragraph
of the charge, is vigorously assailed by the able lawyers representing
appellant, yet we can not conceive ground for complaint in the court

instructing the jury that if they believed from the evidence threats had been made by deceased to take the life of appellant, and that deceased by some act then done, word spoken or demonstration made manifest an intention to execute the threats, appellant would have the right to kill, and if the jury so found they would acquit. Neither was there error instructing the jury that in order to justify slaying deceased, that to appellant, viewed from his standpoint, it must have reasonably appeared from the acts, words or demonstration of deceased that the threats were about to be executed. The criticisms of the charge in these respects are hypercritical. However, the contention of appellant that in requiring the jury to find that appellant "honestly believed the information of threats" was a limitation on the right of self-defense, appellant insists is supported by the case of Tillery v. State, 24 Texas Crim. App., 271. In that case it is said that it is not required that a man must "honestly believe that his life was in danger," but the law is that if it *reasonably* appeared to him that his life was in danger he would have the right to act, etc. By reading the charge herein copied, it will be seen that the word "honestly" is not used in that connection in the charge, but the law is given in that respect as laid down in the Tillery case. The word "honestly" is used in this charge in connection with his belief about the threats communicated to him, and it is inconceivable to us how the use of the word, in the connection used, could have been harmful to defendant. He had testified to a number of threats being communicated to him; no one denied the threats were communicated to him by such persons; the only thing that was done or said to bring in question any of the threats was on cross-examination of defendant, it was sought to show by him that such persons did not associate with deceased, and that, perhaps, they were unworthy of belief, and he was aware of that fact. Such testimony was not sought to be elicited from any person other than appellant, thus bringing home to him any information elicited on that question. The use of the word "honestly" in this case, in instructing the jury that if he honestly believed the threats had been made, perhaps should not have been used, yet we do not believe it could have been hurtful or harmful to him, as there was no evidence that the threats had not been made. If a person did not believe the information that threats had been made, he could not base any right of defense thereon, and if the court had instructed the jury that if defendant *believed* the threats to have been made, no one would question the correctness of the proposition of law, and under the evidence in this case, placing the word "honestly" before the words "believed the threats to have been made," is not such error, if error it be, as would necessitate a reversal of the case.

This case has been ably presented by counsel for the appellant and the State, and while there are numerous bills of exception and assignments of error, we have carefully reviewed each one, although each may not be separately discussed herein, and we have arrived at

the conclusion that while perhaps there are some verbal inaccuracies in the charge, and the court, in discussion with counsel, made remarks it would have been more appropriate for him not to have made, yet taking the case as a whole, no evidence was admitted that should not have been admitted, and the charge as a whole submits the case on the issues made by the testimony, and the judgment should be affirmed, and it is accordingly so ordered.

The complaint of the failure to give the special charges is too general to be considered, and the court having presented the law applicable to the case, no error is shown by failure to give the special charges requested.

The judgment is affirmed.

*Affirmed.*

### ON REHEARING.

#### June 26, 1912.

HARPER, JUDGE.—Appellant has filed a motion for rehearing in which one of his principal contentions is that we erred in holding that there was no error in permitting the State to support its witness Weaver by introducing the testimony of the witness at the examining trial. The witness Weaver had testified to material facts for the State, when on cross-examination the witness was asked by defendant if, since the former trial in this case, he had not said to Mr. Aldredge, in the town of Bovina in a restaurant, that he would tell enough against defendant at the next trial to break his neck; that the Williams boys had put in a dray line in opposition to witness Weaver and were mad at him for testifying as a witness. Weaver admitted that appellant had put in a dray line, but denied emphatically making any such statement. Defendant then introduced Aldredge, who testified Weaver did make such statement. Now, what was the object and purpose of this examination and this testimony? It was to prove that since the former trial Weaver had gotten mad at appellant, would change his testimony and swear to matters on the trial not testified to on the former trial—that his testimony on this trial was a pure fabrication. Appellant could have had no other object and purpose. Appellant cites us to a number of authorities, but none of them are in point. If he had attempted to impeach the witness by proving that his reputation for truth and veracity was bad, of course, his former testimony would be inadmissible to support him, because his reputation would have been the same when he gave the former testimony, and to prove that he had made the same statement on a former occasion would add no verity to it. But this is not that character of question, but the effort made was to prove that the testimony was a fabrication pure and simple, and in that kind of instance the testimony of the witness, given at a time when such motives did not exist are admissible. In the case of Jones v. The State, 38 Texas Crim. Rep., 103, Judge Davidson, in speaking for the court, said:

"All the authorities agree where an attack is made that the witness is prompted by improper motives, or has recently fabricated the story, that under either of these contingencies the party introducing his witness can prove his witness stated the same facts prior to the time when the motive could have existed, or prior to the occasion or circumstances prompting the manufacturing of the testimony." And adds: "We have repeatedly written upon this subject, laying down substantially the same rules that we here state, and deem it unnecessary to even cite authorities," but does cite 1 Whart. on Ev., 2d ed., art. 570, and long list of cases there cited.

In Reddick v. The State, 35 Texas Crim. Rep., 469, Judge Hurt said: "If the defendant attempts to prove that her testimony has been recently fabricated, the State would have the right to show that she stated, soon after the transaction, the same facts. If the defendant attempts to show that improper influences have been brought to bear upon the witness, the State would have the right to prove that before the influences were applied, she told the same tale as she swears to now on the trial," citing authorities. And in English v. The State, 34 Texas Crim. Rep., 200, Judge Hurt, in speaking for the court, said: "Appellant complains of testimony to the effect that the witness gave on the night of the homicide a similar version of the facts attending same, as sworn to by him on the trial. Appellant, before this, had made an attack upon him by trying to prove that his evidence was recently fabricated. Under this state of case, the State had the right to sustain her witness by proving that just after the homicide her witness made the same statement in substance as that sworn to on the trial, and by this means disprove that his testimony was recently fabricated." For other decisions so holding see Ballow v. The State, 42 Texas Crim. Rep., 266; Keith v. The State, 44 S. W. Rep., 849; Mitchell v. The State, 36 Texas Crim. Rep., 278, and authorities cited in these cases. And see Underhill on Crim. Ev., sec. 241, and cases there cited.

The next criticism is that the court erred in permitting witness McDonald to testify as to where appellant's wife was when the shooting took place, on the ground that it was requiring the wife to be a witness against her husband, and that it was the act of a third party for which the defendant was not responsible. We do not question the correctness of those decisions that hold that the wife can not be introduced as a witness against her husband nor compelled to testify against him. This is statutory in this State. The statute reads that the husband and wife shall in no case testify against each other except for an offense committed by one against the other. In this case the State did not offer the wife as a witness and she was not called on to give any testimony. But when the State showed that defendant at the time of the first altercation with deceased rode rapidly to his home, went in the home in search of his gun, was informed that the gun was at a neighbor's; that his brother came up

and a conversation was engaged in, his wife being present; that his brother rode direct to the place where deceased was and a difficulty ensued; that after getting this gun he rode to the place where his brother and deceased were engaged in a fight and fired and killed deceased, the acts and conduct of all three of the parties would be admissible, if such acts tended to show whether the homicide was a preconceived killing, and the fact that one of the parties was his wife and the other his brother would not prevent the acts and conduct of either from being admissible. It is not "permitting the wife" to testify against the husband. (Smith v. The State, 48 Texas Crim. Rep., 235-241.)

The next objection is that we erred in holding there was no error in permitting it to be shown that many of the cattle held by appellant at the time of the first altercation were subsequently watered at the tank. It is shown the whole trouble between appellant and deceased grew out of matters connected with the syndicate ranch, and appellant was holding the cattle next to the fence near where the gate was that led to the tank, and after appellant and deceased had the first words and deceased left to go to the depot and appellant to go and get his gun, these cattle which were being held there by him, were carried in this gate and watered, all knowing that deceased, manager of the ranch, objected thereto. This subsequent act tended to show why they had been driven to this point and were being held there, and threw light on the causes leading up and incident to the fatal difficulty, and the rule of law is that all facts and circumstances, which originate with the person on trial, may be proven if they shed light on the causes leading up to the difficulty, acts and conduct tending to show malice, etc. Underhill on Crim. Ev., sec. 323, and authorities there cited.

All the other questions raised were so fully discussed in the original opinion, we do not deem it necessary to again allude to them, as they relate to the charges which are copied in the original opinion and there discussed at length.

The motion for rehearing is overruled.

*Overruled.*