REYES VASQUEZ v. STATE

No. 28,002. February 15, 1956.

Appellant's Motion for Rehearing Denied (Without Written Opinion) April 4, 1956.

*Albert Armendariz & Mauro Rosas,* [court-appointed] El Paso, for appellant.

*William E. Clayton,* District Attorney and *Edwin F. Berliner,* First Assistant District Attorney, El Paso, and *Leon Douglas,* State's Attorney, Austin for the state.

WOODLEY, Judge.

The conviction is for sodomy; the punishment, 15 years.

Appellant, a 23 year old citizen of Mexican extraction, born and reared in El Paso, in addition to attending a church school for a time, attended the El Paso public schools for five years, where instructions were carried on in English. Thereafter he worked at various jobs such as at the ice factory, parking cars at a parking lot and "in a soda company selling soda." He began drinking when he was 17. At first he drank every week-end after he received his pay, and later "he got to drinking every day whenever he was able to buy it." His drinking habits, according to the testimony, accounted for his employment being unsteady, though he was "working most of the time."

His aunt, called as a witness in his behalf, testified that she had seen him drunk several times. Asked to tell how many times she had seen him drunk, she answered "Well, I have no idea because there are so many times."

On a Saturday afternoon a number of children were playing in an alley among them being the 4 year-old girl victim named in the indictment.

Appellant in a drunken condition made his appearance, and after a time took the little girl by the hand and led her away.

The United States Border Patrol maintains an observation tower some 150 feet in height, equipped with telephone, radio and high powered field glasses or binoculars, overlooking the river and railroad tracks in the vicinity of the Stanton Street Bridge.

Inspector Gamble, on duty in the tower on the afternoon in question, observed through the binoculars a man and child walking west along the railroad track some 75 yards east of the Stanton Street Bridge. They were some 15 feet from some "willows" along the river bank and in the vicinity of a brick building referred to as the molasses factory, and were walking toward down town El Paso.

Inspector Gamble contacted his fellow Border Patrolman Herrera by two-way radio and continued to observe the man and child and to keep Inspector Herrera informed of their whereabouts until they were intercepted by Herrera.

Inspector Herrera testified:

"She was crying. I asked him what was the matter with

her; if it was his daughter. He said, 'No', that she belonged to a friend of his. I asked him how come the child was with him. He said that he had seen another man with the child in Juarez, had her by the hand, and since he recognized the child as belonging to a friend of his, and knew where she lived, he was going to take her home. So then I asked him if he could take me so we could take the child home. He said, 'Yes'. We proceeded to the child's home."

Arriving at the child's home the officers learned that the police had been notified that she was missing and a little boy had told the mother that a grown man had taken her away.

The boy was called but failed to identify appellant as the man who had led the child away, and he was released.

The mother of the child victim testified that when the officers brought her home: "She was just crying and crying. She was hysterical and her face was sort of swollen and black and blue from where she had been hit - - -

"After I took her inside the little girl started crying and asked me for under clothes; that is, for her panties. I then undressed her because I knew she had had some panties on before. Then I saw her privates were bloody.

"Q. Where was the blood, Mrs. Acosta? A. In all her privates, inside, outside.

"Q. Did she have on under pants at that time? A. No, sir.

"Q. Did she tell you what happened? Did she say anything to you? A. She never has said anything. She never has wanted to say anything."

The mother soon found the Border Patrolmen, who had departed, and reported to them and appellant was soon thereafter taken into custody and identified by several of the children, including the boy who had failed to identify him previously. He was lodged in jail and the child was taken to the hospital for examination.

Appellant was thereafter delivered to the officers of the city of El Paso and, after sleeping for some two hours, made a confession which was admitted in evidence and reads:

"I, Reyes (none) Vasquez, after having been duly warned by Detective Phil Lopez, the person to whom this confession is made; that any statement made will be reduced to writing and signed by me and may be used in evidence against me on my trial for the offense concerning which this confession is herein made, wish to voluntarily state the following facts for the reason that said facts are true, viz.

"My name is Reyes Vasquez, and I am 23 years of age; I was born in El Paso, Texas, and at present consider the following address my home, 918 South Mesa Avenue.

"At about 1:00 P.M., on this date, I went to Juarez to drink some Tequila. All in all I think I drank about 15 shots and some beer. I then decided to come back to El Paso, I think it was around 3:00 in the afternoon then. I then headed for a bar at Stanton and 7th Streets and drank a few beers there at the corner bar. After that I headed for my home on Mesa Street. At home I ate a little and then went towards Kansas and Fifth Streets. I went in an alley where I saw some kids playing. I went over and sat down with the boys and girls and I started talking to them. I gave some money to some of the boys and girls that were playing there, so that they could buy some Ice Cream with it. I offered some milk that I had with me to some of the boys but they did not want any of it, so I threw it away. I then took the little girl's hand and led her away. I went south in the alley towards the river. I turned right at 6th Street and got on Kansas Street and headed south again. I then still had the little girl with me. We went across the railroad tracks and down the river bank and into the bushes. I took the little girl over to some water that is located on the edge of the river, I would say is about 10 feet from the bank. There me and the little girl played with a little fish that was swimming in the water. After a little while I picked the little girl up in my arms and carried her up the bank of the river. At this time I want to state that we were still on the American side of the Rio Grande River. I then layed the girl on the spot where I just got through showing you. This spot had bushes around it. I then took her little Levis off of her. Then I took her panties off. As soon as I took her panties off of her, I took them and threw them towards the river. I then took my middle finger and put it in her tail. She started to cry so I stopped for a little while. I then took the same finger and stuck it in her front private. The little girl started to cry again so I stopped. I then tried to stick my peter in her ass, but it was hard to get in. All the time that I was trying to get my peter in her ass, the little girl kept

crying. I would say that all that I really got in the little girl's ass was about the head of my peter. When I saw that it was too much trouble to put it in I quit and then I put her levis back on her. I then took the little girl by the hand and started back over the railroad tracks. We got to about 10th and Kansas when some Immigration Officers stopped us and put us in the patrol car. They took us to where I had picked the little girl up. There they released me so I went to the bar on the corner and drank a couple of beers. When I was leaving the bar I was again arrested and taken to the Immigration Office where I was fingerprinted and turned over to some City Police."

Dr. Frederick P. Bornstein, whose qualifications as an expert medical witness were admitted and stipulated examined the child at 6 P.M. in the El Paso General Hospital. He described her appearance and findings in part as follows:

"A small child, about four years old, and the left side of the face was swollen. — I examined the entire body and injuries were found on her genitals and rectum - - - in that region. This part had been washed so there was no blood on the outside, however, some blood escaped from the female genitals. There was a small tear in the posterior wall of the vagina. In addition a skin tear was located between the vagina and the rectum. In addition a dirty stick protruded from the opening of the rectum. There was some yellowish fluid aspirating from the rectum, which we could not identify in detail on microscopic examination. We also aspirated fluid from the vagina which showed a mixture of blood and sand, and the microscopic examination showed the same blood, red blood cells, and foreign body material, which was probably plant material.

"Q. Plant material? Did you conclude from your professional examination of this child, Doctor, that she had suffered an active external injury to any of her parts? A. Yes.

"Q. What was your conclusion? A. My conclusion was that there was an active injury to the vagina, to the perineum, which is a part of the skin located between the vagina and the rectum, and to the rectum."

Dr. Bornstein testified that the injury to the perineum could have been caused by the stick which somebody had inserted; that the injury to the rectum could have been made by a man's penis but the injury to the vulva could not, and in this connection, testified: "Well, I don't think the vulva at this state

of development can dilate sufficiently to permit that much entry of the penis to get in to produce an injury. On the other hand, the rectum at this stage could be dilated sufficiently to produce this, and that is not untrue anatomically in a small child. One thing is attempted and fail and the other thing is attempted. We know this kind of thing has happened with children of this size with men before. There is a good bit of literature on that subject."

The first ground of error is the overruling of appellant's plea of former jeopardy.

An indictment was returned against appellant charging him with the offense of rape committed upon the child. He was placed on trial for such offense and the evidence at that trial discloses that such indictment was predicated upon the contention that on the same occasion, after leading the child from the alley toward the river and before he was spotted from the U. S. Border Patrol observation tower, appellant had ravished and penetrated the sexual parts of the child.

Appellant was acquitted upon said trial of the offense of rape but was subsequently charged and later indicted for the offense of sodomy, for which offense he was tried and convicted in this cause and has appealed. Appellant therefore relies upon former jeopardy based upon such acquittal, or "autrefois acquit."

The principal, if not the only, material difference between the evidence relied upon by the state in the former trial for rape and the present trial for sodomy lies in the fact that appellant's confession was not offered at the former trial.

The medical testimony to the effect that the injury to the vulva could not have been caused by a man's penis, but the injury to the perineum and rectum could, and the confession admitted on the present trial, makes evident the fact that the state having failed to prove penetration of the child's sexual parts necessary to support a conviction for rape, then turned to the offense of sodomy and has secured a conviction for that offense upon proof of penetration of the anus of the child.

Authorities cited by counsel, both for the state and for appellant, are to the effect that the same transaction may constitute several distinct and several offenses, in which case the

defendant may be separately prosecuted and punished for each, and an acquittal for one is not a bar to a trial for the others.

For the plea of former acquittal to be sufficient it must be the same, but also that the accusatory pleadings in the two prosecutions be susceptible of and sustainable by the same proof, and these two elements must combine, and each is sine qua non to the sufficiency of the defense." 12 Tex. Jur., Sec. 239, p. 557; Lytle v. State, 131 Tex. Cr. R. 27, 95 S.W. 2d 391.

For the plea of former acquittal to be sufficient it must be shown that the proof necessary to secure a legal conviction in the instant case would have sustained a legal conviction in the former. A plea of former acquittal is not good if the evidence necessary to support the second indictment would not have been sufficient to sustain a legal conviction on the first. Branch's Ann. P.C., Sec. 632, p. 321.

The evidence adduced upon the present trial is deemed sufficient to sustain the allegation of the present indictment to the effect that appellant had carnal copulation with the child by inserting his penis into her anus, as in fact his confession so recites, but would in no manner sustain a finding that his sexual organ penetrated her sexual parts.

Under the rule stated, the trial court did not err in overruling the plea of former jeopardy and in declining to submit the issue to the jury.

The child victim, not being a competent witness, did not testify.

While Border Patrolman Herrera, who took appellant and the child into the patrol car and drove them to the child's home, was on the witness stand and after he had identified appellant as being the man, the child victim was brought into the courtroom and in the presence of the jury, and the witness Herrera having observed her testified that she was the child that he saw with appellant at the time in question.

Appellant objected to the child being brought into the courtroom and, by a number of bills of exception, raises the contention that exhibition of the child before the jury "was an inexcusable exhibition of an incompetent witness for the sole purpose of inflaming the minds of the jurors."

24

We know of no rule of law which would prevent the state from having the child victim identified in the presence of the jury as the crying child appellant was leading by the hand and the child who was taken to the hospital for examination.

The fact that the victim was a four-year-old girl dressed in blue jeans and a sweater was before the jury, and there is nothing in the record which would indicate that her appearance at the time of the trial, some months later, was other than that of a normal four-year-old child.

Bills of Exception 7, 8, 9 and 10 are relied upon as presenting error in the admissing of the confession and the overruling of appellant's motion to have same withdrawn from the jury.

Bill No. 7 recites that appellant objected to the introduction and reading of the confession to the jury; that the objection was overruled and appellant excepted. No grounds of objection are stated in this bill and reversible error is not shown therein.

Bill No. 8 is deficient for a like reason. It recites that at the end of the testimony appellant moved to strike the confession and reserved exception to the court's refusal to grant the motion, without stating any reason why the confession should be stricken.

Bill No. 9 merely certifies that a motion for mistrial was made at the conclusion of the testimony which the court refused, and appellant excepted. There is nothing in this bill to show the ground upon which appellant sought to have the court declare a mistrial.

Bill No. 10 recites that appellant moved for a directed verdict at the end of the testimony, which was refused and appellant excepted. No question other than the sufficiency of the evidence, which need not be raised by bill of exception, is presented by this bill.

The statement of facts reflects that the confession was offered while the witness Philip Lopez was on the stand. Appellant's counsel, anticipating that the state was about to go into "objectionable material," requested that the jury be retired "so that we can argue law involving this particular matter."

The trial court was not obliged to hear argument on law questions during the introduction of the evidence, and no question was before the court at the time the request to have the jury retired was made.

The motion being overruled, the witness was handed "a paper" which he identified as a statement made to him by appellant.

No request was made that the court hear testimony in the absence of the jury before ruling upon the admissibility of the statement.

The witness Lopez testified fully as to the making of the confession, the warning given and the translation, signing and witnessing thereof. The witness testified that before the statement was made he read to appellant the warning appearing at the beginning of the confession, and such warning, which appears to be in the form provided by statute, was read to the jury.

When the state was ready to read the confession to the jury, appellant's counsel requested that its reading be deferred until he had cross-examined the witness Lopez and the request was granted.

On cross-examination, and after the witness had repeatedly testified that he read the warning appearing on the confession to appellant, he was asked and answered: "Q. Now, sir, did you tell him that this statement could be used for or against him? A. That's right."

Following the cross-examination the confession was offered in evidence and the following is reflected by the statement of facts.

"Mr. Armendariz: If the Court please, defense will object and except to the reading of the statement on the ground that the police officer has admitted on cross-examination - - -

"The Court: Direct your remarks so that the Court may hear them.

"Mr. Armendariz: That the police officer has admitted on cross examination that the warning was that this statement could be used for and against him and that such a statement is

inadmissible under such a warning, because it implies that it will be used for him and not only against him.

"The Court: Did counsel hear that question?

"Mr. Berliner: It was my understanding - - -

"The Court: Mr. Berliner, it isn't your understanding. Mr. Armendariz, in a low tone of voice and fast voice, said, 'You told him it could be used for or against him.'

"Mr. Berliner: I am sorry. I didn't get that.

"The Court: It is very important to the admissibility in the case. You have to get it cleared up.

"Mr. Armendariz: If the Court please, at this time I would like to move for a mistrial on the basis of the remarks of Judge Jackson regarding the questioning as to the particular item that is in issue here, namely whether Officer Lopez understood that he said for and against him or not.

"The Court: Your objection will be received and overruled, and the Court will reserve the right to state in the record why he made the statement.

"Mr. Berliner: Q. I'll ask you again, Mr. Lopez, to look at this portion of this statement, commencing here and terminating here. (Indicating) Would you read that to yourself again, please. A. Okay.

"Q. Was that read to this defendant before this statement was signed? A. That is correct.

"Q. In what language was it read to this defendant? A. Read to him in English. I told him in Spanish what it meant.

"Q. Now, how did you go about telling him in Spanish? A. Well, more or less just about what it says on the top, that if he didn't want he didn't have to give us a statement.

"Q. Did you translate it to him to the best of your ability? A. That's right.

"Q. What this states from English to Spanish? A. That's right.

"Mr. Armendariz: Your Honor, the witness has already testified he didn't translate it, he explained it. That's the testimony.

"The Court: Yes, that's the testimony.

"Mr. Berliner: Q. Did you explain it to the best of your ability to this defendant what this statement contains in English and translated it to Spanish? A. That's right.

"Mr. Armendariz: Your Honor, that question has been asked and answered already.

"The Court: I am permitting it in view of the cross-examination.

"Mr. Berliner: Did you add anything, Mr. Lopez, in your Spanish explanation to him of this portion? Did you add anything else to what is printed here in the English tongue? A. No, I didn't.

"Mr. Berliner: All right. We offer to read the statement in evidence, if the Court please.

"Mr. Armendariz: If the Court please, we again interpose our objection and exception to it.

"The Court: Objection overruled. You may read the statements."

The court did not err in admitting the confession over the objection quoted.

It is contended that the remarks of the court violated the provisions of Art. 707, V.A.C.C.P., for which reversal should be ordered.

The learned and beloved trial judge died before the record on appeal was perfected and we are without the benefit of the explanation promised in his ruling.

At the time his remarks were made the trial judge was considering the admissibility of the confession. The objection was based upon the fact that the witness had testified on cross-examination (in answer to a question propounded in a low tone and fast voice, which the attorney for the state did not hear or understand), and that his last answer was contrary to the

oft repeated testimony of the witness to the effect that he read the warning as it appeared at the beginning of the confession. The trial court's remark suggested that such testimony on cross-examination was important to his ruling on the admissibility of the confession, and the matter should be cleared up.

The fact question as to the appellant being duly and properly warned, as required by Art. 727, V.A.C.C.P., was not submitted to the jury. There was no request that an issue as to the admissibility of the confession be submitted, and no objection to the omission of such a charge appears.

There being no issue for the jury in the matter, we are at a loss to understand how appellant could have been prejudiced by the trial court's remarks. Not every comment of the trial judge requires reversal. Whether reversal is called for depends upon the consequences which probably result therefrom. Herridge v. State, 127 Tex. Cr. R. 284, 76 S.W. 2d 522.

The test is whether the remarks are upon the weight of the evidence or indicate to the jury the judge's opinion of the merits, and whether the remarks were prejudicial to the defendant's rights. Williams v. State, 67 Tex. Cr. R. 287, 148 S.W. 763.

Under the facts before us, the remarks of the trial court were not such as to call for reversal.

Appellant's attack upon the court's charge because aggravated assault was not submitted cannot be considered in the absence of an objection in writing, timely filed, or a requested charge timely presented, and exception reserved.

At the close of the testimony appellant moved for a mistrial or, in the alternative, moved that the confession be stricken. He also asked for an instructed verdict. This is shown by the statement of facts and is predicated upon testimony offered by appellant as well as the evidence adduced by the state, which appellant contended in his motion showed that appellant was a mentally deficient person between a moron and an imbecile and of a mental age of four years and seven months, and the confession of a person of such low mentality is not admissible in evidence.

The theory of appellant appears to be that the facts mentioned show that appellant was not a competent witness and,

for the same reason that he could not testify, his confession should be withdrawn from the jury.

As has been stated, there was no request that an issue as to the admissibility of the confession be submitted to the jury. Therefore, to agree with appellant's contention it would be necessary that we reach the conclusion that as a matter of law appellant was not competent to testify, and to hold further that such fact made his confession inadmissible as a matter of law.

We are not prepared to so hold, and are cited to no authority which appears to us to support appellant's position.

Art. 708, V.A.C.C.P., provides that all persons are competent to testify except insane persons, certain convicts and "2. Children or other persons, who after being examined by the court appear not to possess sufficient intellect to relate transaction with respect to which they are interrogated, or who do not understand the obligation of an oath."

Appellant was not tendered as a witness and we cannot interpret his counsel's request that the jury be retired in order that "we can argue law involving this particular matter" as a request that the trial judge examine appellant in the jury's absence in order to pass upon his competency as a witness, as an incident to the question of the admissibility of the confession.

There is no contention here that appellant was or is insane. While the testimony as to his low mentality would not be without weight on the question, the evidence mentioned does not show that appellant was an incompetent witness or that his confession should have been excluded.

Appellant, in his brief, points out other reasons for his belief that the confession should not have been admitted, such as appellant's intoxicated condition.

The state's testimony was to the effect that he was drunk when apprehended, but had slept for more than two hours prior to making the confession and had, to an extent, sobered.

Again, though evidence to the effect that appellant was intoxicated at the time the confession was made would be relevant on the question of its admissibility, evidence to that effect would not alone and as a matter of law require that the confession

be excluded. The extent to which he was deprived of his facilities due to intoxication would determine the question of his competency or incompetency.

We commend appellant's court-appointed counsel for the diligent discharge of their duties to their client, as shown by the record and demonstrated in oral argument before this court.

No reversible error appearing, the judgment is affirmed.