**Walter BELL, Jr., Appellant,**

v.

**The STATE of Texas, Appellee.**

**No. 57898.**

Court of Criminal Appeals of Texas, En Banc.

Jan. 24, 1979.

Rehearing En Banc Denied April 4, 1979.

Jesse R. Funchess, Houston, for appellant.

Tom Hanna, Dist. Atty. and John R. DeWitt, Asst. Dist. Atty., Beaumont, for the State.

## OPINION

TOM G. DAVIS, Judge.

Appeal is taken from a conviction for capital murder. V.T.C.A. Penal Code, Sec. 19.03(a)(2). The jury returned an affirmative finding to each special issue submitted under Art. 37.071(b), V.A.C.C.P., and accordingly the punishment was assessed at death.

The record reflects that the bodies of Fred and Irene Chisum were found in the bathtub of their home in Port Arthur on Friday, July 19, 1974. Irene Chisum had last been seen alive at about 6:40 p. m. the prior evening. Fred Chisum was last seen alive at about 8:45 p. m. the same evening.

The bodies of the Chisums were discovered after they failed to arrive at the business they owned and operated known as the "Appliance Service Center." The Chisums' service manager, Harry Creswell, sent John Brocks to their home about 11:45 a. m. on Friday, July 19, 1974, to check on them. He found the front door ajar and the interior of the home in disarray. He reported back to Creswell, who immediately notified the police and instructed Brocks to return to the Chisums' home and meet the police. Creswell's testimony also established that it was common knowledge among the service center's employees that the Chisums were known to keep the business' receipts at their home overnight. The record also reflects that the appellant had been employed at the Appliance Service Center for some seven weeks when his employment was terminated on July 5, 1974.

The investigating officers testified that the interior of the home bore signs of violence and that it appeared that the Chisums had been stabbed and strangled. Numerous items of physical evidence from the home as well as photographs of the scene were introduced into evidence.

On the same day the bodies of the Chisums were discovered, appellant attempted to cash a check drawn on the Chisums' account at the Sabine National Bank. The appellant first came under suspicion when the investigating officers began to check on recently fired employees from the Chisums' business. The investigating officers were advised by the Sabine National Bank that an individual, later identified as appellant, who attempted to cash a check drawn on the Chisums' account was wearing a green football jersey with the number "12" on it and that he was using an identification card bearing the name "Bobby Williams."

After the appellant's arrest, he executed a written consent to the search of his residence, where the police recovered numerous incriminating items, including the ends of an electrical extension cord, other pieces of which were found near the Chisums' bodies, and a plastic container of coins, which were shown to have been taken from the Chisums' residence. Both the football jersey and the identification card were also recovered from the appellant's residence.

Appellant gave two written statements, both of which were admitted into evidence after a *Jackson v. Denno*[1] hearing. Both of the confessions admit the murder of the Chisums. The second written confession also implicates a co-defendant, Sheppard Watson, and admits the robbery and rape of Irene Chisum.[2] The written confessions

1. 378 U.S. 368, 84 S.Ct. 1774, 12 L.Ed.2d 908 (1964). See Art. 3822, Sec. 6, V.A.C.C.P.

2. Appellant's second written confession, omitting the warnings and signatures, reads in part as follows:

"My name is . . . Walter Bell, Jr., and I am a Negro male, 20 years old. I live at 1310 E. 10th. rear, Port Arthur, Texas. I live alone at that address. At the present time I am a laborer at Local 853 on Thomas Blvd. in Port Arthur, Texas. I am also an amateur boxer. "In the morning hours of July 20, 1974, I gave a statement to Calise Blanchard of the Jefferson County District Attorney's Office and I did not tell all of the truth in that statement and I would like to tell the truth in this statement and correct that statement that I made on July 20, 1974.

"On July 15, 1974, I was at Gilham Circle along with Sheppard Watson whom I call 'hobo', and we were just talking and 'hobo' said that he needed some money to go to the Jazz Festival in Houston on the 19th and 20th of July. We discussed going out to the house of Mr. and Mrs. Ferd [sic] Chisum and robbing the Chisums. I told 'hobo' to meet me around the Soul Kitchen at 11:00 P.M. we left from the Soul Kitchen (this was Thursday night July 18, 1974) and went to my house to get my bag. I had some handcuffs that I had gotten in Fort Worth at a boxing tournament and some extension cord that was light brown. This cord is the kind that has two wires that run side by side and are more flat than round. Then I had cut the ends of the extension cords off at my house before Sheppard and I got over to my house on the night of the 18th of July. I also had my military separation papers in this bag. This bag is a small brown zipper bag with a Marine Corps emblem on the front of it. I also had a butter knife that I had sharpened and it was in the bag also.

"Sheppard Watson, 'hobo', and I then walked from my house out to the Chisum house. When I was working at Appliance Service Center for Mr. Chisum, Johnny Brocks and I had taken Jerry Brocks out to Mr. Chisum's house so that Jerry could cut the grass. That is how I knew where Mr. and Mrs. Chisum lived. We walked real fast and I guess it took us about thirty minutes to get from my house to the Chisum house.

"I was wearing a grey T-shirt with VOTE written on the front of it and some plum colored pants (these pants are very light plum colored) and some black slip on shoes. I was also wearing a blue Levi jacket.

" 'Hobó' was wearing a blue muscle T-shirt and black pants and a pair of black shoes.

"When we got to the Chisum house I knocked two times on the front door and Mr. Chisum came to the door and said 'Who is it?', and I said, 'it's me, Walter', and Mr. Chisum opened the front door and he said 'you'll come on in' and Hobo and I then went into the house and into the living room. Mr. Chisum said, 'What can I do for you Walter?' I told Mr. Chisum that I was there to ask him for my job again. Mr. Chisum had fired me from my job at Appliance Service Center on July 12, 1974, because Jerry Brocks had bent the door on one of the trucks on a call when I was with him. Mr. Chisum had fired Jerry and I both at this same time. I told Mr. Chisum (while at the house with 'Hobo') that the damage to the truck was not my fault and that it was Jerry's fault and that I wanted to go back to work if it could be possible. Mr. Chisum told me 'I'm sorry that it happened but people have told me that you and Jerry have been racing in the truck and had been f_____ around on the job and taking too much time.' I asked Mr. Chisum for some papers of mine that he had that I needed to get into school on a G.I. loan and he told me that they were at the store. He told me to come to the store Tuesday (meaning Tuesday July 23, 1974) and he would see what he could do to help me. He also asked me if I liked working on machines and if I liked fixing things and I told him yes I did. After we finished talking and we were ready to leave I opened my bag and pulled out the butter knife on Mr. Chisum and told him to sit down. He then sat down on the couch in the livingroom [sic] and I put the handcuffs on him. I had given Sheppard the butter knife to hold on Mr. Chisum while I put the handcuffs on him. I then called Mrs. Chisum into the livingroom since she had been in the back part of the house. Mrs. Chisum then came into the living room and sat down. I tied her legs and her hands and we told them to go into the bedroom in the front of the house where there are two twin beds. I brought Mr. Chisum into the bedroom in the front and Sheppard took Mrs. Chisum into the room where there is a couch and a typewriter and a desk. I then went and cut the telephone wire in the front bedroom. Mr. Chisum was trying to get out of the bedroom so I started wrestling with him and I beat him with my two fists and knocked him down while he was on the floor I stuck him two times with the butter knife in the chest area. At this time Mr. Chisum was handcuffed and his feet were tied together with the extension cord I had brought from my

were consistent with numerous items of physical evidence found at the scene of the crime.

On Monday, July 21, 1974, the appellant volunteered to accompany the investigating officers to the Chisums' home and to point out the location of some checks which had been part of the day's business receipts that the officers had been searching for without success. When they arrived at the Chisums, appellant pointed out the location of the checks, which were found inside a book.

Officer Calise Blanchard then related a complete oral confession given by the appellant at the scene while he reenacted the entire crime.

The record further reflects that appellant's fingerprint was found at the scene. A pathologist testified that Irene Chisum died from asphyxiation due to strangulation. He also testified that he found evidence that Irene Chisum had engaged in sexual intercourse at some time soon before her death. A chemist from the Texas Department of Public Safety testified that human blood, type B, was found on various items of clothing and other pieces of physical evidence taken from the Chisums' residence. Type B human blood was also present on a pair of appellant's pants that the State contended the appellant had been wearing at the time of the crime.

The appellant offered evidence of an alibi and testimony that, although a high school graduate, he had been in a special education program in the Port Arthur Independent School District.

The sufficiency of the evidence is not challenged by the appellant. We note that the transcription of the court reporter's notes of appellant's trial, exclusive of the individual voir dire, comprises some 2,700 pages. We would also note that the State offered some 239 items of evidence and the defendant offered over 30 exhibits.

house (when I stabbed Mr. Chisum he had untied his feet). Mr. Chisum did not try to get up and run after I had stabbed him. While I was in the front bedroom with Mr. Chisum, Sheppard was in the little room with the couch, typewriter and desk f_____ Mrs. Chisum. He was f_____ her on the couch. When I had finished with Mr. Chisum, I went into the little room where Sheppard and Mrs. Chisum were and I f_____ Mrs. Chisum. Mrs. Chisum was tied up with electrical cord that I had brought from my house and only her hands were tied. Mrs. Chisum did not have any panties on but did have a blue housecoat and a brassier. I made Mrs. Chisum get up off of the couch and take off her housecoat and brassier. After I finished f_____ Mrs. Chisum I tied her back up. While I was f_____ Mrs. Chisum Sheppard was looking through the house and I could hear him pulling out drawers and opening doors and making noise and moving furniture. After . . . Sheppard and I had tied Mrs. Chisum back up (her feet) I choked her with a towel. During the time that Sheppard and I f_____ Mrs. Chisum she had a towel in her mouth as a gag and she could not talk. After I choked her I brought her into the bathroom and Sheppard and I put her body in the bathtub. After we put Mrs. Chisum's body in the bathtub we then went into the front bedroom and dragged Mr. Chisum from that bedroom and down a short hall and into the bathroom and pushed his body into the bathtub.

"Sheppard and I then started looking around the house together. We looked everywhere in the house and I took a tape player and some tapes. These tapes were reel type tapes and not cartridge type tapes. I got three watches, two mens and a womans, and $11.00 from the wallet of Mr. Chisum's wallet and a little plastic box with some new coins that were a half dollar, a quarter, a nickel, a dime and a penney [sic]. Sheppard found some money with three checks in an envelope in the ice box in the kitchen. This was $391.00.

"I would like to add that after we had finished f_____ Mrs. Chisum, she wrote a check out to Bobby Williams at our command in the amount of $600.00 and signed the check. Sheppard and I had untied her hands at this time so that she could sign the check. Right after Mrs. Chisum had signed the check is when I choked her to death.

"I then went into the dining room and used the phone and called Flash Cab Co. and the lady there said there were no cabs there. I then called Jet cab and the lady asked me the address I was at and I told her 1020 El Paso. She asked again what the address was and I told her it was something like L-a-s P-a-s-o, and the man said he could not understand so I hung the phone up and left. Before we left the house Sheppard and I split the money up and I got $190.00 and Sheppard kept the rest of the money."

■ The appellant initially contends that the trial court erred "in refusing to submit a charge to the jury during the competency hearing in regards to the question of the defendant's retardation . . . ."

The record reflects that a question of appellant's competency to stand trial having been presented to the trial court, a separate jury was impaneled and a trial of the appellant's present competency conducted. The jury found the appellant competent. Although appellant in his brief asserts that he objected to the court's charge at the competency trial, the record fails to disclose that such objection or requested charge was presented to the court at the competency trial. Nothing is presented for review. Arts. 36.14 and 36.15, V.A.C.C.P.

■ The appellant next contends that the trial court erred "in refusing to incorporate testimony on the issue of defendant's competency into the court records." There is no citation to the record or discussion in appellant's brief with respect to this contention. Our own examination of the record leads us to believe that appellant is complaining of the trial court's failure to transcribe certain testimony elicited at appellant's competency trial and have it read to the jury during the guilt-innocence stage of appellant's trial.

The record reflects that during the trial on guilt or innocence a defense witness, Dr. Ruilman, who had testified at the competency trial, was not present. There was discussion between appellant's counsel, the prosecutor, and the trial judge of whether his testimony from the competency trial could be transcribed and presented to the jury in lieu of having him return to testify. It appears that a written stipulation was entered wherein the appellant and the State stipulated that the testimony of Dr. Ruilman from the competency trial would be transcribed and presented to the jury. It does not appear, that this was ever done. The record does, however, reflect that immediately thereafter Dr. Ruilman appeared in person and testified as a defense witness. No error is shown.

■ Appellant next contends that the trial court erred "when a juror was stricken because he expressed some conscientious scruples against the death penalty."

The record reflects the following from the voir dire of Josephine Asbury upon examination by the prosecutor:

"Q. Would the fact that the death penalty would become mandatory if you made the appropriate answers to these questions and made a finding of guilt of Capital Murder, would the fact that the death penalty would then become mandatory have any effect in your general deliberation as to any fact issue in the case, either at the guilt stage or the punishment stage?

"A. Yes.

"Q. You say it would, I take it from the answer that you have some conscientious belief against the death penalty as a punishment for crime?

"A. Yes, sir.

"Q. Could you—and I must ask you this question—it's our final question, Mrs. Asbury. Can you conceive of any situation in which you as a juror could render answers to the questions that would cause the death penalty to be inflicted? Could you conceive of any case where you could vote for a verdict that would result in the death penalty?

"A. What do you mean?

"Q. Well, could you conceive of—for example, a fact situation, a murder bad enough or a situation horrible enough that you as a juror could make these answers knowing that the answers would result in the death penalty?

"A. No; I just don't believe in the death penalty."

After further examination by appellant's counsel, the following exchange took place between the trial court and the prospective juror:

"THE COURT: . . . you would be asked certain other questions and you will know that if those questions are answer-

ed one way the Court will have to impose the death penalty, and you will know that if the questions are asked [sic] another way a life sentence will have to be imposed. Now, will that have any effect on you in determining what the truth is with respect to the questions which are asked you?

"VENIREMAN ASBURY: I'm afraid it would."

At this point the trial court sustained the prosecutor's previously made challenge for cause.

It is clear from the examination of the prospective juror set out above that sustaining the State's challenge for cause did not violate the teaching of *Witherspoon v. Illinois,* 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968). Furthermore, it is clear that Asbury was disqualified because of her testimony that her opposition to the death penalty would affect her deliberation on the issue of the facts submitted at the punishment phase of the trial. See V.T.C.A. Penal Code, Sec. 12.31(b); *Moore v. State,* 542 S.W.2d 664 (Tex.Cr.App.), cert. denied, 434 U.S. 935, 97 S.Ct. 2666, 53 L.Ed.2d 266 (1977); *Burns v. State,* 556 S.W.2d 270 (Tex.Cr.App.1977); *Hughes v. State,* 562 S.W.2d 857 (Tex.Cr.App.), cert. denied, —— U.S. ——, 99 S.Ct. 268, 58 L.Ed.2d 250 (1978); *Chambers v. State,* 568 S.W.2d 313 (Tex.Cr.App.1978). No error is shown.

■ The appellant next contends that the trial court erred in ordering a blood sample be taken from the appellant during the course of the trial in order to determine his blood type.

During the course of the trial, the State sought to prove appellant's blood type by introduction of appellant's medical records from the United States Marine Corps. The appellant's objection to the admission of these records was sustained because they were not properly authenticated. The State then proposed that the court order a blood sample be taken at that time from the appellant to determine his blood type. The appellant strenuously objected on the grounds that such a test would violate his right of self-incrimination under the Fifth

Amendment of the United States Constitution. The trial court overruled the objection and ordered the sample taken by a registered nurse outside the presence of the jury. The trial court ordered the court reporter to accompany the appellant, his counsel, and the nurse while the sample was taken in order to make a record of the transaction for this Court. Subsequently, testimony from a laboratory technician was admitted, again over appellant's objection that the evidence was obtained in violation of his rights under the Fifth Amendment of the United States Constitution, that appellant's blood type was O positive.

In *Schmerber v. California,* 384 U.S. 757, 86 S.Ct. 1826, 16 L.Ed.2d 908 (1966), a case involving a conviction for driving while intoxicated, the United States Supreme Court specifically rejected the argument that withdrawal of a sample of a defendant's blood and receipt in evidence of a chemical analysis of the blood violated the self-incrimination clause of the Fifth Amendment. See also *Breithaupt v. Abram,* 352 U.S. 432, 77 S.Ct. 408, 1 L.Ed.2d 448 (1957); *Irvine v. California,* 347 U.S. 128, 74 S.Ct. 381, 98 L.Ed. 561 (1954); and compare these with *Rochin v. California,* 342 U.S. 165, 72 S.Ct. 205, 96 L.Ed. 183 (1952).

In *Olson v. State,* 484 S.W.2d 756 (Tex.Cr.App.1972), this Court held that compelling a handwriting sample from a defendant does not constitute compelling an accused to "give evidence against himself" in violation of the Texas Constitutional provision on self-incrimination. The Court further held that compelling a blood test, if taken under conditions which comport with due process, likewise does not violate the state privilege against self-incrimination. This Court reasoned that such tests are non-testimonial in nature and thus the self-incrimination privilege is not implicated under such circumstances. The Court in *Olson* further noted that many types of physical evidence are compellable from an accused consistent with both the Fifth Amendment of the United States Constitution and Art. I, Sec. 10, of the Texas Constitution. A partial list of these types of physical evidence include

fingerprints, examination of the tongue, fingernail scrapings, footprints, requiring the accused to stand in a lineup, requiring the accused to raise his hand before the jury, a paraffin test, requiring the accused to put on clothes and speak before the jury.

Recently, in *Escamilla v. State*, 556 S.W.2d 796 (Tex.Cr.App.1977), this Court held that the taking of a blood sample was a search and seizure within the meaning of Art. I, Sec. 9, of the Texas Constitution, and thus the State was required to comply with the provisions of Art. 1.06 and Chapter 18, V.A.C.C.P. At the time of the *Escamilla* decision, it would have been impossible to obtain a valid warrant since blood was not one of the items for which a search warrant could issue under Art. 18.02, V.A.C.C.P. Since that time, Art. 18.02, supra, has been amended. The holding in *Escamilla*, supra, was recently reaffirmed in *Smith v. State*, 557 S.W.2d 299 (Tex.Cr.App.1977), where this Court made clear again that the holding in *Escamilla* was grounded on the search and seizure provisions of the Texas Constitution.

In the instant case, the only objection to the admission of the results of the blood typing test was as follows:

"MR. FUNCHESS: Your Honor, we would like to object to any testimony about the blood type or any other aspect about this particular sample being exhibited or reported in front of this jury inasmuch as I think that a prior witness has testified that any blood which might have been given to Mrs. Cutter was seized in violation—was seized without the consent of this defendant, over his objection and we have asserted that the particular sample was seized in violation of the Fifth Amendment of the Constitution and Article 1.02 of the Texas Code of Criminal Procedure and many, many other cases on that subject and we would like to object to this witness testifying as to any particular blood experimentation or report or sampling that she might have had occasion to do."

Under the holding of *Schmerber v. California*, supra, this objection was properly overruled. In *White v. State*, 521 S.W.2d 225 (Tex.Cr.App.1975), this Court reversed a conviction on the grounds of an illegal search and seizure of the defendant's car. The decision of this Court was "reversed" by the United States Supreme Court in *Texas v. White*, 423 U.S. 67, 96 S.Ct. 304, 46 L.Ed.2d 209 (1975). In *White v. State*, 543 S.W.2d 366 (Tex.Cr.App.1976), on remand from the United States Supreme Court, it was urged that the conviction could still be held invalid under the provisions of Art. 1, Sec. 9, of the Texas Constitution. In Part III of the opinion, this Court stated:

"We do not reach this question. The appellant's sole reliance in the trial court was on cases construing the Fourth Amendment to the United States Constitution. . . . At no time during the trial of this case did the appellant urge that Article I, Sec. 9 of the Texas Constitution supported his motion to suppress.

"It is fundamental that the grounds for reversal urged on appeal must comport with the objections made at trial. See e. g., *Smith v. State*, 513 S.W.2d 823, 830 (Tex.Cr.App.1974); *Campbell v. State*, 521 S.W.2d 636, 637 (Tex.Cr.App.1975). Otherwise nothing is presented for review. *Smith v. State*, supra; *Campbell v. State*, supra.

"This rule extends to allegations of constitutional error. *Foreman v. State*, 505 S.W.2d 564, 566 (Tex.Cr.App.1974)."

We are therefore compelled to hold that the trial court's overruling of appellant's objection to the introduction of evidence of the blood sample was proper under the teachings of *Schmerber v. California*, supra, and the question of the applicability of Art. I, Sec. 9, of the Texas Constitution, and *Escamilla v. State*, supra, is not before us. Appellant's contention is overruled.

■ The appellant next contends that the trial court erred "in refusing to order the district attorney and/or other law enforcement agencies to identify seventeen (17) sets of fingerprints allegedly found at the scene of the crime, none of which belong to the appellant." The appellant argues that the failure to compel the State to

identify the other fingerprints amounted to a suppression of evidence, citing *Napue v. Illinois,* 360 U.S. 264, 79 S.Ct. 1173, 3 L.Ed.2d 1217 (1959), and *Brady v. Maryland,* 373 U.S. 88, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963).

The record reflects that Officer Herbert F. Johnson of the identification section of the Port Arthur Police Department testified regarding the fingerprints found at the Chisums' home. Eighteen latent fingerprints were introduced into evidence. One of these, a thumbprint, was found to match the known thumbprint of the appellant. The officer testified that he was unable to identify the remaining seventeen latent prints. He testified that they had been compared against all known suspects in the case and that they could not be identified. He testified also that he attempted to obtain the fingerprints from the bodies of the two victims, but was unable to obtain sufficiently readable prints. We would also note that we have carefully reviewed the testimony of Officer Johnson and have failed to find where the appellant requested the "order" or motion for such an order referred to in appellant's ground of error. We would further note that his brief contains no references to where such a request can be found in the record.

It is clear from Officer Johnson's testimony that the existence of the unidentified fingerprints was fully disclosed to the jury and in fact the State offered the unidentified prints into evidence as State's exhibits. It also appears that they had been tendered to defense counsel. Officer Johnson carefully explained why he was unable to identify the prints and fully explained the identification procedures that were used. No suppression of evidence is shown. Appellant's contention is overruled.

■ Appellant next contends that the trial court erred in not allowing him "to mention the lack of fingerprint identification in the presence of the jury." The circumstances relating to the seventeen unidentified fingerprints have been fully explained in the previous ground of error. In his brief, appellant argues "that since the State was allowed to introduce into evidence the existence of fingerprints at the scene of the crime, appellant should have been allowed to pursue the examination of Officer Johnson in order to place before the jury the fact that no conclusive fingerprints of the appellant were found." In his brief, appellant makes no citation to where in the record he was not allowed to "pursue the examination of Officer Johnson." We have reviewed the cross-examination of Officer Johnson by appellant's counsel and find that appellant's contentions in his brief on appeal are not supported by the record. The record reflects that appellant's counsel was allowed wide latitude in cross-examining Officer Johnson and our review of the record fails to disclose any action on the part of the trial court such as appellant asserts in his brief. No error is shown.

■ Appellant next contends that the State failed to prove that his confessions were voluntarily made. It appears to be appellant's precise contention that, "As a matter of law appellant lacked the mental capacity to effectively waive his rights in making confessions and/or statements."

The record reflects that two written confessions were admitted into evidence as well as three "oral confessions" which led to "fruits of the crime." The trial court conducted extensive hearings outside the presence of the jury in order to determine the admissibility of the written and oral confessions. Findings of fact and conclusions of law were made and are filed in the record. The trial court found that the appellant was given all required warnings and that both the written and oral confessions were freely and voluntarily made. In his brief, appellant does not challenge any of these findings on either a factual or legal basis. His sole contention appears to be that as a matter of law the confessions are inadmissible because "appellant is mentally retarded and lacked the capacity to read and understand certain statements."

The record does not support appellant's conclusions. The record reflects that appellant, although a participant in the special education program in the Port Arthur Inde-

pendent School District, did receive a high school diploma. There was considerable disagreement among the various witnesses as to appellant's current IQ score, although all agreed that the appellant could properly be characterized as mildly retarded.

Dr. C. J. Ruilman, a psychiatrist called by the defense, was questioned on direct examination by appellant's counsel as to whether the appellant would "have some problem in conceptualizing things like 'waiver' and 'rights' and, you know, abstract concepts, waiver of rights and . . . ." The witness answered, "I should think Walter Bell would be able to get the general idea but would be somewhat deficient in conceiving of the ramifications of waivers of rights and questions of that sort. I think he would probably get the gist of it." On cross-examination, the witness was asked whether the appellant would have the ability to relate the incidents contained in the various confessions. The witness answered, "I would believe that Walter Bell could give an account such as this, but I do not believe that Walter Bell could put it in such neat and appropriate sentence structure . . ." The witness also acknowledged that the appellant could certainly have understood the instructions that he could stop the interrogation at any time.

In *Casias v. State,* 452 S.W.2d 483 (Tex. Cr.App.1970), this Court stated:

> "It has been said that there is a general agreement among courts that a confession of crime is not inadmissible merely because the accused, who is not insane, was of less than normal intelligence, *Vasquez v. State,* 163 Tex.Cr.R. 16, 288 S.W.2d 100, and mere illiteracy has not been considered as a form of mental subnormality. *Berry v. State,* 58 Tex.Cr.R. 291, 125 S.W. 580. In *Vasquez,* the confession was held to be admissible where the accused was shown to have been a 'mentally deficient person between a moron and an imbecile' who had a 'mental age of four years and seven months.' "

The Court also stated:

> "Of course, if mental subnormality is so great that an accused is incapable of

understanding the meaning and effect of his confession, then it would not be admissible. *Grayson v. State,* 40 Tex.Cr.R. 573, 51 S.W. 246."

In *Grayson v. State,* 438 S.W.2d 553 (Tex. Cr.App.1969), this Court held that whether a defendant had the mental competency or intelligence required to waive his right to remain silent and to have counsel present prior to the giving of the confession was for the court and the jury, and the testimony of a psychologist concerning the defendant's IQ of 51 was not conclusive and did not require a finding that the State failed to demonstrate a knowing and intelligent waiver of the right of self-incrimination. In *Nash v. State,* 477 S.W.2d 557 (Tex.Cr. App.1972), this Court, relying on *Grayson v. State,* supra, and *Casias v. State,* supra, held that a defendant with an IQ of 76 and an intelligence-emotional level of a 12-year-old was not as a matter of law incapable of waiving his rights. See also *Encina v. State,* 471 S.W.2d 384 (Tex.Cr.App.1971); *Bizzarri v. State,* 492 S.W.2d 944 (Tex.Cr. App.1973); *Price v. State,* 496 S.W.2d 103 (Tex.Cr.App.1973).

In this case, as in *Brantley v. State,* 522 S.W.2d 519 (Tex.Cr.App.1975), the appellant's contention that he is mentally incapable of knowingly and intelligently waiving his right to counsel or his right to remain silent is simply not borne out by the evidence.

■ Appellant next contends that "the court erred in refusing to dismiss the indictment against the appellant on the basis of the death penalty's unconstitutional and arbitrary application in violation of law." The appellant relies on the cases of *Furman v. Georgia,* 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972), and *Jurek v. Texas,* 428 U.S. 262, 96 S.Ct. 2950, 49 L.Ed.2d 929 (1976). We find appellant's reliance on *Jurek v. Texas,* supra, to be misplaced since in *Jurek* the United States Supreme Court found that the Texas capital sentencing procedures, like those of Georgia and Florida, were not violative of the Eighth and Fourteenth Amendments to the United States Constitution. See *Gholson and Ross*

*v. State,* 542 S.W.2d 395 (Tex.Cr.App.1976), cert. denied, 432 U.S. 911, 97 S.Ct. 2960, 53 L.Ed.2d 1084· (1977); *Livingston v. State,* 542 S.W.2d 655 (Tex.Cr.App.1976), cert. denied, 431 U.S. 933, 97 S.Ct. 2642, 53 L.Ed.2d 250 (1977); *Woodkins v. State,* 542 S.W.2d 855 (Tex.Cr.App.1976), cert. denied, 431 U.S. 960, 97 S.Ct. 2688, 53 L.Ed.2d 279 (1977); *Granviel v. State,* 552 S.W.2d 107 (Tex.Cr.App.), cert. denied, 431 U.S. 933, 97 S.Ct. 2642, 55 L.Ed.2d 250 (1977). Appellant's contention is overruled.

■ Appellant next contends that the trial court erred in failing to find jury misconduct because the jury deliberated for only one hour before finding appellant guilty of capital murder.

In *Garcia v. State,* 435 S.W.2d 533 (Tex. Cr.App.1968), a non-capital case, a similar contention was advanced and it appeared that the jury deliberated for approximately 20 minutes before reaching their verdict. This Court stated:

"This Court as early as *Turner v. State,* 74 S.W. 777 (Cr.App.1903) said:

'The law has fixed no time in which jurors shall make up their mind as to what their verdict shall be. There is no reflection upon their conduct in any way other than the fact that they were not out considering their verdict exceeding five minutes. This is not misconduct on the part of the jury, and affords no ground setting the verdict aside.'

See also Ann. 91 A.L.R.2d 1238."

See also 41 Tex.Jur.2d, New Trials, Sec. 76, at 193. No error is shown.

■ Appellant next contends that the trial court erred in denying his motion for a change of venue. The record reflects that appellant timely filed a motion for change of venue. See Art. 31.03, V.A.C.C.P. The State properly controverted the motion. See Art. 31.04, V.A.C.C.P. Compare *Stapleton v. State,* 565 S.W.2d 532 (Tex.Cr.App. 1978); *Durrough v. State,* 562 S.W.2d 488 (Tex.Cr.App.1978). The trial judge conducted an extensive hearing on appellant's motion for change of venue and denied the motion. Compare *Henley v. State,* 576 S.W.2d 66 (1978).

At the hearing on the change of venue question, appellant presented several witnesses employed by both the print and electronic news media in Jefferson County. All these witnesses testified that the news coverage of appellant's case had been about average for a case of this nature. Each testified that the news coverage had not been excessive or inflammatory. In addition, each was of the opinion that the appellant could receive a fair trial in Jefferson County. Numerous exhibits were introduced reflecting the various articles that had appeared in local newspapers and transcriptions of television and radio news broadcasts. The appellant specifically cites exhibits which indicate that the District Attorney had indicated that he would seek the death penalty in appellant's case, that the appellant would undergo a psychiatric examination, and that the appellant had made a confession to the murders. In addition, there are several photographs of the appellant while in custody, apparently being led to and from court. Appellant particularly complains that the photographs of him "displaying his race" and indicating that he was being defended by a lawyer formerly associated with the NAACP demonstrate prejudicial pretrial publicity.

An examination of the exhibits introduced at the hearing on the motion for change of venue indicates that all the information contained in the news reports was accurate and apparently placed there for the purpose of informing the public of current events. *Adami v. State,* 524 S.W.2d 693 (Tex.Cr.App.1975); *Morris v. State,* 488 S.W.2d 768 (Tex.Cr.App.1973); *Taylor v. State,* 420 S.W.2d 601 (Tex.Cr.App.1967). There is no showing that by reason of pretrial publicity there existed in the public mind a prejudice so great as to prevent appellant from receiving a fair and impartial trial. *Morris v. State,* supra; *Taylor v. State,* supra.

■ We must, however, remember that the question of whether a change of venue should be granted because of prejudicial publicity is one of constitutional dimension

and the test to be applied by the court is whether outside influences affecting the community's climate of opinion as to a defendant are so inherently suspect that the resulting probability of unfairness requires suitable procedural safeguards. *Adami v. State,* supra. In *Irvin v. Dowd,* 366 U.S. 717, 81 S.Ct. 1639, 6 L.Ed.2d 751 (1961), eight of the twelve jurors at the defendant's state court trial thought that he was guilty before the trial began. The United States Supreme Court struck down defendant's conviction on the ground that pretrial publicity had resulted in a denial of due process. In *Rideau v. Louisiana,* 373 U.S. 723, 83 S.Ct. 1417, 10 L.Ed.2d 663 (1963), a 20-minute TV film of the defendant's "confession" was broadcast several times on the local television stations. Again the conviction was struck down, the Supreme Court holding that under these facts prejudice must be presumed. In *Estes v. Texas,* 381 U.S. 532, 85 S.Ct. 1628, 14 L.Ed.2d 543 (1965), the defendant's trial was conducted in a "circus atmosphere" due to the intrusion of press and TV equipment in the courtroom. Again the United States Supreme Court struck down the conviction, finding that under those facts prejudice must be presumed. In *Shepard v. Maxwell,* 384 U.S. 333, 86 S.Ct. 1507, 16 L.Ed.2d 600 (1966), the Supreme Court found that the defendant's trial was infected with extremely inflammatory publicity and that the courthouse had been given over to the media in order to accommodate the public's appetite for carnival. Again the court found that prejudice must be presumed from those facts. We should, however, compare the foregoing United States Supreme Court cases with *Beck v. Washington,* 369 U.S. 541, 82 S.Ct. 955, 8 L.Ed.2d 98 (1962), where the court found that pretrial publicity surrounding the trial of a

former president of the Teamsters' Union was not so intensive or extensive as to raise a question as to the believability of the jurors' answers to the questions propounded to them on voir dire. Likewise, in *Murphy v. Florida,* 421 U.S. 794, 95 S.Ct. 2031, 44 L.Ed. 589 (1975), the Supreme Court held that prospective jurors' exposure to information about the defendant's prior crimes and news accounts of the crime for which he was charged did not presumptively deprive the jurors of impartiality nor deny the defendant due process.[3]

In the instant case, the trial court was presented with conflicting testimony with respect to the issue of whether the appellant could obtain a fair trial in the local community because of pretrial publicity. The appellant has simply failed to demonstrate that the trial court abused its discretion in declining to grant a change of venue. *Ransonette v. State,* 522 S.W.2d 509 (Tex.Cr.App.1975), cert. denied, 423 U.S. 941, 96 S.Ct. 350, 46 L.Ed.2d 274 (1976); *Freeman v. State,* 556 S.W.2d 287 (Tex.Cr. App.1977), cert. denied, 434 U.S. 1088, 98 S.Ct. 1284, 55 L.Ed.2d 794 (1978).

■ Appellant next contends that the trial court erred in hearing the appellant's motion to suppress his confession and the results of a lineup together outside the presence of the jury. The record reflects that appellant's counsel affirmatively agreed to this procedure. No error is shown.

■ Appellant next contends that the trial court erred in failing to grant his specially requested charge on whether the appellant had the mental capacity to consent to the search of his premises.

An examination of the court's charge reveals that the trial court instructed the jury as follows with respect to this issue:

3. See also *Calley v. Callaway,* 519 F.2d 184 (6th Cir. 1975) (en banc) (in the My Lai court-martial case, the Court of Appeals found the petitioner had not been deprived of a fair trial by prejudicial publicity); *United States v. Haldeman,* 181 U.S.App.D.C. 254, 559 F.2d 31 (1976) (en banc) (in a trial of one of the Watergate defendants, the Court of Appeals held that the trial court correctly refused requests for a

change of venue or a continuance when the defendants failed to show any actual prejudice among the members of the jury); see also *People v. Speck,* 41 Ill.2d 177, 242 N.E.2d 208 (1968), reversed as to death penalty only, 403 U.S. 946, 91 S.Ct. 2279, 29 L.Ed.2d 855 (1971) (the Illinois Supreme Court found that there was no showing that any of the 12 jurors who sat on the jury was prejudiced).

"You are instructed that under our law as applicable to this case any search of the premises of the accused without a search warrant, or voluntary consent of the defendant to search, written or oral, would not be lawful. Therefore, in this case should you fail to find from the evidence beyond a reasonable doubt, or if you have a reasonable doubt thereof, that consent to the search of the premises of the defendant was voluntarily and understandingly given either orally or in writing, or any combination thereof, then such search would be unlawful and you would wholly disregard the same, and any evidence obtained as a result thereof."

We find the instruction given by the trial court to be a correct statement of the law and no error is shown in refusing the defendant's specially requested charge on this issue.

■ The appellant next contends that the trial court erred in denying his specially requested charge regarding the voluntariness of the confession because he was mentally retarded "to the extent that he was incapable of knowingly, intelligently, and voluntarily making said confession."

An examination of the charge given reveals that the trial court fully instructed the jury on the law applicable to the admissibility of both the written and oral confessions made by the appellant. The trial court specifically charged the jury that as to each written confession:

"If you fail to find from the evidence beyond a reasonable doubt, or if you have a reasonable doubt thereof, that the same was freely and voluntarily, considering each of said exhibits separately, that prior to the time the defendant gave the alleged statement or statements or confession or confessions he was warned as aforesaid or that he did not knowingly, intelligently, and voluntarily waive said right prior to and during the making of said statement, then such statement would not be voluntary and in such case, you will wholly disregard said statement

or confession and not consider it for any purpose . . . ."

The record further reflects that the court charged the jury in substantially the same manner with respect to the oral confession made by the appellant. We find the charge to the jury to be proper and that appellant's specially requested charge singling out the issue of mental retardation would have been an improper comment on the weight of the evidence.

■ The appellant next contends that the trial court erred in failing to submit his specially requested charge on circumstantial evidence. The confessions of the appellant constitute direct evidence of his guilt. Where such confessions are admitted into evidence, there is no requirement to charge on circumstantial evidence. See and compare *Williams v. State,* 566 S.W.2d 919 (Tex.Cr.App.1978), with *Ridyolph v. State,* 545 S.W.2d 784 (Tex.Cr. App.1977).

■ Appellant next contends that the trial court erred "in refusing to compel the prosecuting attorney to disclose certain oral statements allegedly made by the appellant while under arrest and in custody."

The appellant does not cite us to any portion of the record where the trial court ordered the discovery of appellant's oral confessions. Further, examination of the record discloses that at the time evidence of appellant's oral confessions came into evidence, no objections were made on this basis. Nothing is presented for review.

■ Appellant in his final ground of error contends that fundamental error is presented in the court's charge by the "inflammatory wording regarding specific intent to kill." In argument under this ground of error it appears, however, that the appellant is complaining that there was a comment on the weight of the evidence. No objection was voiced in the trial court. We have carefully examined the com-

plained-of section of the charge and find no fundamental error.[4]

The judgment is affirmed.

---

4. The complained-of portion of the court's charge reads as follows:

"Before you would be warranted in convicting the defendant of capital murder, you must find from the evidence beyond a reasonable doubt not only that on the occasion in question the defendant was engaged in the commission of the felony offense of robbery of Irene L. Chisum, as defined in this charge, but also that during the commission of the robbery the defendant beat the said Irene L. Chisum with his hands and fists, or choked and strangled her with his hands, or choked and strangled her with a piece of cloth, with the intention of thereby killing her. Unless you find from the evidence beyond a reasonable doubt that the defendant, on the occasion in question, specifically intended to kill Irene L. Chisum when he so beat, choked or strangled her, if he did so beat, choke or strangle her, you cannot convict him of the offense of capital murder."