WR-48,152-06
COURT OF CRIMINAL APPEALS
AUSTIN, TEXAS
Transmitted 1/12/2015 5:08:38 PM
Accepted 1/13/2015 9:30:06 AM
ABEL ACOSTA
CLERK

EX PARTE GARCIA GLEN WHITE

WRIT NO. 48,152-06

RECEIVED
COURT OF CRIMINAL APPEALS
1/13/2015
ABEL ACOSTA, CLERK

IN THE COURT OF CRIMINAL APPEALS

AT

AUSTIN, TEXAS

_____

Cause No. 723847

| | | |
|---|---|---|
| EX PARTE | § | IN THE 180TH DISTRICT COURT |
| | § | OF |
| GARCIA GLEN WHITE,<br>Applicant | § | HARRIS COUNTY, TEXAS |

## STATE'S MOTION TO DISMISS APPLICATION FOR WRIT OF HABEAS CORPUS AND DENY REQUEST FOR STAY OF EXECUTION

Respondent, the State of Texas, by and through its Assistant District Attorney for Harris County, files this, its Motion requesting that the Court of Criminal Appeals dismiss the applicant's application for writ of habeas corpus and request for stay of execution. The applicant does not satisfy the requirements for the filing of a subsequent writ application under TEX. CODE CRIM. PROC. ANN. art. 11.071, § 5, and, alternatively, the applicant's grounds for relief are meritless. In support, Respondent would show the following:

1

# I. PROCEDURAL HISTORY

The applicant is confined pursuant to the judgment and sentence of the 180th District Court of Harris County, Texas, in cause number 723847 (hereinafter "the primary case"), wherein a jury convicted the applicant of the felony offense of capital murder. On July 23, 1996, the jury answered "yes" to the first two special issues, and "no" to the last, and the trial court assessed punishment at death.

The Court of Criminal Appeals affirmed the applicant's conviction in an unpublished opinion delivered on June 17, 1998. *White v. State*, No. 72580 (Tex. Crim. App. June 17, 1998)(not designated for publication).

On February 21, 2001, the Court of Criminal Appeals denied the applicant relief on his initial state habeas application. *Ex parte White*, WR-48,152-01 (Tex. Crim. App. Feb. 21, 2001).

On April 17, 2001, the applicant filed his initial federal habeas petition. However, the applicant subsequently moved to dismiss his petition in order to return to state court, and the federal district court granted the applicant's motion on January 9, 2002. *White v. Thaler*, No. H-02-01805, 2011 WL 4625361 (S.D. Tex. Sept. 30, 2011).

On January 11, 2002, the applicant filed a subsequent habeas application, cause no. 723847-B. The Court of Criminal Appeals dismissed

2

the applicant's subsequent state habeas application for abuse of the writ on April 24, 2002. *Ex parte White*, WR-48,152-02 (Tex. Crim. App. April 24, 2002).

On May 3, 2002, the applicant filed a federal habeas petition, and the district court granted the applicant an administrative stay pending the results of DNA testing. *White v. Thaler*, No. H-02-01805, 2011 WL 4625361 (S.D. Tex. Sept. 30, 2011).

On June 30, 2007, and January 28, 2009, the applicant filed additional subsequent state habeas applications, cause nos. 723847-C and 723847-D. The Court of Criminal Appeals dismissed both of these habeas petitions on May 6, 2009. *Ex parte White*, WR-48,152-03 & WR-48,152-04 (Tex. Crim. App. May 6, 2009).

On September 30, 2011, following the completion of the applicant's post-conviction DNA testing, the federal district court dismissed the applicant's federal habeas petition and denied the applicant a certificate of appealability (COA). *White v. Thaler*, No. H-02-01805, 2011 WL 4625361 (S.D. Tex. Sept. 30, 2011).

On April 1, 2013, the Fifth Circuit Court of Appeals denied the applicant's application for COA. *White v. Thaler*, 522 Fed. App'x. 226, 2013 WL 1442568 (5th Cir. 2013).

On January 13, 2014, the United States Supreme Court denied the applicant's petition for writ of certiorari. *White v. Stephens*, 134 S.Ct. 907 (2014).

The applicant is scheduled for execution on January 28, 2015.

## II. TRIAL PROCEEDINGS

### State's Evidence at Guilt-Innocence

King Solomon was a sixty-four year old man who was married and had seven children (XV S.F. at 35). Bonita Edwards was his girlfriend in November 1989, and she lived with her identical twin daughters, Annette and Bernette, the complainant (XV S.F. at 35-6). Solomon would often see Bonita on the weekends and call her during the week (XV S.F. at 38). He talked to her on the telephone on Wednesday, November 29; however, she did not answer the phone when he called her the next day (XV S.F. at 39). In fact, there was no answer for the following two days (XV S.F. at 39).

On the third day, Saturday morning, Solomon went over to Bonita's apartment (XV S.F. at 40). He knocked on her door, but there was no answer (XV S.F. at 40). He then returned home and watched television for much of the day (RR. XV - 41). Later in the day, Solomon had his wife drop him off approximately two blocks from Bonita's apartment (XV S.F. at 41). He walked over to her apartment and saw another man standing on the porch

4

(XV S.F. at 41).  The other man claimed to be responsible for maintenance but stated that he did not have a key to the apartment (XV S.F. at 41).  The man told Solomon to get the manager (XV S.F. at 41).  When the apartment manager opened the door, Solomon saw two bodies on the floor (XV S.F. at 45).  The manager then pulled the door back and said, "Don't you-all come in" (XV S.F. at 46).

Leonard Dawson, Houston Police Department homicide crime scene unit, was called to the scene (XV S.F. at 56-7).  There was no sign of forced entry on the front door to the apartment, and all of the windows were locked and closed (XV S.F. at 69, 149).  A bloody sock was found underneath the Christmas tree (XV S.F. at 83).  The door to the south bedroom appeared to have been forced open (XV S.F. at 91, 151).

Bonita was found in the dining and living room area (XV S.F. at 66-7).  She was wearing a blue and white printed blouse and black panties (XV S.F. at 167).  She had fourteen stab wounds in her chest: seven superficial and seven that were five to six inches deep into her left chest area (XVII S.F. at 275, 278, 280).  One stab wound perforated her heart and the others penetrated her left lung (XVII S.F. at 278).  All of the seven deep wounds had the potential to kill her (XVII S.F. at 282).  Bonita also had a contusion on the right side of her neck (XVII S.F. at 277).

Annette was found just inside the front door next to a love seat (XV S.F. at 66-7). She was wearing only a pair of panties (XV S.F. at 84). She sustained eight stab wounds to her chest, one stab wound in her neck, and two defensive wounds: a stab wound in her right arm and a cutting wound on her right hand (XVII S.F. at 287-288, 292-93). One of Annette's chest wounds involved her left lung and was fatal (XVII S.F. at 291). The neck wound penetrated into her trachea (XVII S.F. at 292). She also suffered from two blunt trauma abrasions over her left cheek (XVII S.F. at 288-89).

The complainant, Bernette, was found in the south bedroom facing a dresser and a bed (XV S.F. at 67-8). A pink shirt was wrapped around the back of her neck and through her mouth to form a gag (XV S.F. at 85, 147). There was a white discharge near her vaginal area and a white substance on her lower abdomen indicating a possible sexual assault (XV S.F. at 147). Semen was detected on her vaginal and rectal swabs (XVI S.F. at 247). She had two stab wounds to her neck, eleven stab wounds to her chest, stab wounds in the left elbow and hand, a cutting wound on the right hand, and a stab wound on her right arm (XVII S.F. at 300). Any one of the two stab wounds to the neck or of the five to the chest were sufficient to cause death (XVII S.F. at 307). The applicant's DNA matched that of the semen gathered

from the complainant, and the probability that the applicant was the source of the semen was 99.9999 percent (XVII S.F. at 384-85).

Tecumseh Manuel was a thirty-four year old man who had known the applicant "like a brother" for his entire life (XVI S.F. at 185). The applicant told Manuel that he stabbed a woman and her twin daughters (XVI S.F. at 186). On July 20, 1995, Manuel relayed this information to Todd Miller, Houston Police Department homicide division (XVI S.F. at 186, 189). The applicant was arrested for the crime at approximately 8:20 p.m., the next day and read his *Miranda* warnings (XVI S.F. at 190-91).

The applicant gave a videotaped statement in which he stated that he and Terrence Moore went over to Bonita's apartment and that both men had rocks of cocaine. *State's Ex. 55.* The men agreed to share their drugs with Bonita in exchange for sex. *State's Ex. 55.* Both men got naked; however, neither was able to get sexually aroused, and they refused to share the drugs with Bonita. *State's Ex. 55.* The applicant stated that Bonita then became upset and grabbed a knife out of the kitchen drawer. *State's Ex. 55.* The applicant grabbed her from behind while Moore took the knife from Bonita. *State's Ex. 55.* The applicant stated that he then threw Bonita on the floor while Moore stabbed her. *State's Ex. 55.*

The applicant further stated that, while Bonita was screaming and kicking, Annette and the complainant ran out of the bedroom. *State's Ex. 55.* The applicant grabbed the daughter who ran toward the front door. *State's Ex. 55.* He touched her breasts and vagina, held her down with his hand over her mouth, and then ejaculated on her. *State's Ex. 55.* Meanwhile, Moore forced open the bedroom door to get the other daughter. *State's Ex. 55.* Moore then exited from bedroom and stabbed the daughter that was with the applicant. *State's Ex. 55.* The applicant stated that Moore was wearing gloves and never ejaculated. *State's Ex. 55.*

After an investigation, Miller determined that Moore had been killed on July 25, 1989, or four months prior to the deaths of the complainant, her sister and her mother (XVI S.F. at 205-6, 224). On July 28, 1995, Miller again interviewed the applicant (XVI S.F. at 206). After advising the applicant of his rights, Miller confronted the applicant with the information regarding Moore (XVI S.F. at 206-7). The applicant waived his rights and gave another videotaped statement during which he stated, "I made it all up…With the Mom…She reached for a knife, and I took the knife and stabbed her…Some kids come out…I went into the bedroom after them. Stab…I stabbed one in the bedroom and one in the living room. That's all I want to talk about." *State's Ex. 56.*

8

During the punishment phase, the State reoffered all of the evidence admitted during the guilt phase and introduced evidence that on March 20, 1995, the applicant received two years in a state jail for theft which was probated for three years (XX S.F. at 8)(XXI S.F. at 449, 452). John Thomas, a Harris County adult probation officer, testified that the applicant used marijuana and tested positive for cocaine (XXI S.F. at 454, 460).

The State also presented evidence regarding the murder of Greta Williams. At approximately 11:30 a.m., on November 1, 1989, Philip Clark, Houston Police Department, was called to the 3400 block of Linn where he met Raymond Manuel (XX S.F. at 22, 26). Manuel directed Clark to a vacant house at 3419 Linn (XX S.F. at 23). Clark pulled back a sheet of plywood that covered one of the windows and saw a body in the back of the house (XX S.F. at 24).

Wayne Wendel, Houston Police Department homicide division, responded to the scene where he saw both Manuel and the applicant (XX S.F. at 29). The house was boarded up and had been used by neighborhood drug users (XX S.F. at 30). Inside was the body of Greta Williams; she had been beaten to death and was partially covered by a carpet (XX S.F. at 31). There was evidence of severe trauma to her head, and there were medium velocity

blood spatter stains along the west wall which indicated repeated blows (XX S.F. at 37, 40). Williams' clothes were found under her body, and there were some broken teeth next to her neck (XX S.F. at 38, 39). Also at the scene was a cigarette lighter with blood on it and a used condom on the back steps (XX S.F. at 54-5).

On November 2, 1989, Harminder S. Narula, a Harris County medical examiner, performed the autopsy on Williams (XX S.F. at 92). She had blunt trauma over her face, head, chest, back, left forearm, and left hand, and six lacerations on her left eyelid, mouth and chin (XX S.F. at 95-6). She had a fracture on her left upper jaw, loose teeth in her lower jaw, and chipped and broken upper teeth (XX S.F. at 97). There was bruising and a slight tear on her heart as well as fractured ribs and a partial crushing of her liver (XX S.F. at 100). Williams died from blunt trauma to her head, face, chest, and abdomen which caused the fractured jaw, fractured ribs, and lacerated liver (XX S.F. at 102-3). A drug screen was negative, and there was no evidence of semen in the body (XX S.F. at 103-4).

Wendel talked to Manuel three different times about the Williams' murder (XX S.F. at 43). Furthermore, police took a written statement from the applicant concerning the incident (XX S.F. at 46, 65). The applicant stated that he was sitting on a front porch when Williams came by and asked what

was up (XX S.F. at 86).  The applicant stated that Williams then left, and he saw two guys named Daniel Noel and Tony Trahan say "hey baby" to her (XX S.F. at 87).  The case was referred to the grand jury, but the applicant was no-billed (XX S.F. at 49-50).

On July 13, 1995, sixteen-year-old Hau Trung Pham was working with his father on Roland Street in his father's convenience store (XIX S.F. at 32-3).  Pham's father weighed approximately 111 pounds and was 57 years old (XIX S.F. at 54).  At approximately 11:00 that morning, the applicant and another man came into the store and then left (XIX S.F. at 34, 51).  At about 3:00 p.m., Pham was sleeping in the storeroom when he heard a scream (XIX S.F. at 34).  The two men had returned, and one of them grabbed his neck and told him to open up the cash register (XIX S.F. at 35).  Pham saw his father laying on the floor with the applicant standing next to him (XIX S.F. at 35, 42).  There was a broken chair very close to his father (XIX S.F. at 43).  Pham's father had blood in his eyes and was not saying anything (XIX S.F. at 37).  One of the robbers then picked up the cash register and fumbled underneath it, and then the other robber took Pham into the back of the store and put a milk pot on his head (XIX S.F. at 37).  When the men left, Pham called the police (XIX S.F. at 37-43).

11

James L. Crowson, Houston Police Department, responded to the call at the Village Food Market at 3115 Roland (XIX S.F. at 11). He saw that an older Asian man had a large gash over his left eye and was incoherent (XIX S.F. at 12). Crowson did not call the crime scene unit because the crime was just an aggravated robbery at the time; however, Pham's father died within a few days as a result of the injuries sustained during the robbery (XIX S.F. at 14). No suspects were detained at the scene (XIX S.F. at 17).

Todd Miller, Houston Police Department homicide division, was contacted about the Roland Street robbery on July 17, 1995, after Pham's father died (XIX S.F. at 60-1). During his investigation, he talked to Terrence Davis, Perry Harvey, and Tecumseh Manuel (XIX S.F. at 65). Manuel told Miller about the Roland Street robbery and the present triple murder on Weaver (XIX S.F. at 67). The applicant then confessed to the crime. *State's Ex. 96*.

On July 17, 1995, Eduardo Bellas, Harris County medical examiner, conducted an autopsy of Pham's father (XIX S.F. at 81). The victim had a fracture immediately above his eyeballs which was consistent with multiple blows to that area (XIX S.F. at 84). The primary causes of death were a fractured skull, brain contusions and lacerations, and infections to both lungs which was a complication of the other injuries (XIX S.F. at 84).

12

<u>Defendant's Evidence at Punishment</u>

Lizzie White, the applicant's mother, testified that she named the applicant after a nurse's last name (XXI S.F. at 225). White had seven children; the applicant was the third oldest and was born in Houston (XXI S.F. at 226-27). She lived in Kashmere Gardens and in the Fifth Ward area of Houston (XXI S.F. at 228).

The applicant's mother testified that the applicant went to Hilliard Elementary School, Fleming Middle School, and Wheatley High School, and that he was a poor student but had good conduct (XXI S.F. at 229-30). He did not miss a day of school in the twelfth grade (XXI S.F. at 234). White testified that her son got along well with everyone and did not have trouble with the juvenile authorities; however, when the applicant was about fourteen years old, he took one of her cars (XXI S.F. at 235). Also, she was once called to school because the applicant did not dress for physical education (XXI S.F. at 236).

White testified that the applicant played football for Wheatley as a starter and graduated in 1981 (XXI S.F. at 237). The applicant then went to Lubbock Christian College to play football; but he busted one of his knees in 1982 and ended his football career (XXI S.F. at 239-40). The applicant dropped out of school and returned to Houston to recuperate (XXI S.F. at

13

240).  The applicant then started painting houses and working for his father, Leon Charles, who had a mechanic's shop (XXI S.F. at 241).  The applicant left home when he was about twenty-one and went to live with the Manuel family (XXI S.F. at 247).

White stated that, in 1984, the applicant started sandblasting buildings with a company called Clean America (XXI S.F. at 244).  In March of 1988, the applicant was hospitalized with a hurt hand and head after falling three or four stories off of a building (XXI S.F. at 246).  When the applicant was released from the hospital, he did not come around the family as much (XXI S.F. at 248).  He started hanging out with drug users and was living with the mother of his children at the Manuels (XXI S.F. at 249).  The applicant had three children: fourteen-year-old Christopher, ten-year-old Porsha, and six-year-old Jared (XXI S.F. at 249).  The applicant was behind in child support; however, he still loved his children (XXI S.F. at 253).  Finally, White asked the jury to give her son a life sentence (XXI S.F. at 254).[1]

Monica Garrett, the applicant's sister, testified that the applicant was a nice brother and that she helped him with his homework (XXI S.F. at 271).  She also stated that the applicant was a good football player, but his college

---

[1]  During cross-examination, it was revealed that the applicant knew Tecumseh and Raymond Manuel since junior high school (XXI S.F. at 259).

career ended with a knee injury after his first semester (XXI S.F. at 273). Finally, she asked the jury for a life sentence (XXI S.F. at 275).[2]

Robert Yohman, Ph.D., clinical neuropsychologist, testified that he reviewed the applicant's records and tested him with the Wechsler Adult Intelligence Scale, academic achievement batteries, and personality tests (XXI S.F. at 312-13). Yohman stated that the applicant had an IQ of 76, which was in the sixth percentile for intellectual functioning and on the borderline between average and mental retardation (XXI S.F. at 315-16). The applicant did not have elevated levels of distress in his life which suggested that he was handling his impulses through denial (XXI S.F. at 326-27). Yohman stated that cocaine use could accentuate impulsive behavior caused by a head injury (XXI S.F. at 336). Yohman concluded that the applicant would not be a future danger in a controlled prison environment because of the limitations on cocaine use (XXI S.F. at 346).[3]

Dennis Nelson, Ph.D., stated that the applicant had an IQ of 85 to 87 (XXI S.F. at 392). He concluded that the applicant was reasonably

[2] It was revealed during cross-examination that the applicant could do better with grades when he applied himself, and the applicant never asked for help with his problems (XXI S.F. at 277-78).

[3] During cross-examination, Yohman admitted that there was no evidence that the applicant suffered a brain injury (XXI S.F. at 352). He also stated that, if the applicant lied during the interview, then the diagnosis of cocaine addiction was inaccurate (XXI S.F. at 365). Yohman stated that the applicant was capable of anger and lust (XXI S.F. at 370). Finally, Yohman admitted that his conclusions were based on the assumption that drugs are not available to prison inmates (XXI S.F. at 375).

15

responsible, not violent, fairly quiet, somewhat socially inhibited, and not prone to digging into trouble (XXI S.F. at 410). The applicant told Nelson that cocaine was the major drug that he abused (XXI S.F. at 413). Nelson stated that the applicant was dependent on circumstances and that a properly functioning prison should be a controlled environment (XXI S.F. at 425).

## III. APPLICANT FAILS TO MEET ART. 11.071, § 5 REQUIREMENTS ALTERNATIVELY, APPLICANT'S CLAIMS ARE MERITLESS

In the instant application for writ of habeas corpus filed on January 8, 2015, the applicant urges two issues relating to the admission of his custodial statement: (1) that his invocation of counsel is entitled to more deference due to his alleged borderline IQ; and, (2) that the Texas Constitution mandates additional scrutiny of the applicant's invocation of counsel due to the applicant's alleged mental limitations or illness.

In support of his allegation of a borderline IQ, the applicant relies on the 2008 psychological report of Patricia M. Averill, Ph.D., which was previously included with the applicant's third subsequent state habeas application, cause no. 723847-D. *Applicant's Exhibit 3*. According to Dr. Averill's report, the applicant achieved a Full Scale IQ score of 78 on a Wechsler Adult Intelligence Scale – Third Edition. Dr. Averill concludes that, while the applicant does not qualify for a diagnosis of mental retardation, he

16

functions at a borderline intellectual level, and his intellectual limitations likely result in social vulnerabilities. Dr. Averill states that the applicant's adaptive functioning is difficult to ascertain due to a lack of information, but she remarks that the applicant attended college on a football scholarship until he sustained a knee injury; that the applicant maintained employment for several years; that the applicant had a family; that the applicant got along well with others; and, that the applicant had no social/interpersonal skill difficulties. Notably, Dr. Averill reaches no conclusions regarding the applicant's ability to invoke his right to counsel.

The applicant also proffers the 1998 report of Jerome Brown, Ph.D., a report that was previously presented in the applicant's initial state application for writ of habeas corpus, cause no. 723847-A. *Applicant's Ex. 4.* Dr. Brown's report, however, contains no reference to the applicant's intellectual functioning. Rather, the thrust of the report is that the applicant does not represent a danger to others provided he is not using street chemicals; that the applicant adjusted well to prison; and, that the applicant should respond well to a structured environment and provide no problem for prison authorities.

Notwithstanding that the instant habeas petition is labeled an "original" habeas application and that it was filed directly with the Court of

17

Criminal Appeals, the applicant does not meet the statutory requirements for filing a subsequent state application for writ of habeas corpus. *See* TEX. CODE CRIM. PROC. art. 11071, § 5. The instant habeas claims are merely reiterations of previously urged and rejected claims. On direct appeal, the Court of Criminal Appeals overruled the applicant's challenge to the admissibility of his custodial statement, based on his alleged invocation of his right to counsel. *White*, No. 72580, slip op. at 4-8. The applicant urged the same claim in his initial state habeas application, and the Court of Criminal Appeals adopted the trial court's findings and denied the applicant habeas relief. *White*, No. 48,152-01, slip op. at 2.

In his second subsequent state habeas petition, cause no. 723847-C, filed in 2007, the applicant alleged that he suffered from impairment and mental problems, including cocaine addiction, and was not competent to waive his rights to silence and counsel. *Applicant's writ, cause no. 723847-C, at p. 3, 7.* Included with the applicant's petition was the 2002 evaluation of Seth Silverman, M.D., referencing the punishment phase trial testimony of Robert Yohman, Ph.D., a clinical neuropsychologist, and Dennis Nelson, Ph.D.,

a psychologist, concerning the applicant's intellectual functioning.[4] *Applicant's writ, cause no. 723847-C, Exhibit E.* The purpose of Dr. Silverman's evaluation, however, was not to gauge the impact of the applicant's alleged limited intellectual functioning on his ability to waive his right to silence and counsel but to examine the applicant's drug use at the time of the primary offense and its effect on his judgment and ability to engage in deliberate thought. *Applicant's writ, cause no. 723847-C, Exhibit E at 1.*

In his third subsequent state habeas petition, cause no. 723847-D, filed in 2009, the applicant relied on Dr. Averill's 2008 report, which the applicant again presents in the instant habeas application, to argue that trial counsel was ineffective for failing to discover his IQ of 78. *Applicant's writ, cause no. 723847-D, at 3-5.*

In his habeas petition filed in federal district court, the applicant again challenged the admissibility of his confession, arguing, in part, that he was not competent to waive his *Miranda* rights due to his substance abuse. The

---

[4] Dr. Yohman testified that he evaluated the applicant in order to ascertain his cognitive and emotional status. Based on that evaluation, Dr. Yohman concluded that the applicant had a cocaine dependency and borderline intellectual functioning but no major psychopathology (XXI S.F. at 298). Dr. Yohman stated that the applicant's IQ was 76, placing him in the 6th percentile for intellectual functioning or the borderline range (XXI S.F. at 315-16). Dr. Nelson testified that the applicant's IQ was in the 85 to 87 range (XXI S.F. at 392).

federal district court held that the applicant's claim was meritless. *White*, No. H-02-01805, 2011 WL 4625361, at *12-14.

Finally, in his petition to the Fifth Circuit, the applicant again challenged the admissibility of his confession, arguing, in part, that he was not competent to waive his rights. The Fifth Circuit overruled the applicant's claim, noting the testimony of the officer who conducted the applicant's interview that the applicant was not intoxicated at the time of questioning, and the applicant specifically told the officer that he was drug free for a few days. *White*, 522 Fed. App'x. at 231, 2013 WL 1442568, at *5. In sum, the applicant presents nothing new in the instant habeas petition.

Further, there is no support for the applicant's assertions regarding his ability to invoke counsel or request for heightened scrutiny of his invocation of counsel. *See Delao v. State*, 235 S.W.3d 235, 241 (Tex. Crim. App. 2007)(holding that the totality of the circumstances standard for assessing the voluntariness of a confession given by a person of normal mentality is the appropriate standard to apply when a confession is made by someone suffering from mental retardation and mental illness). The Court of Criminal Appeals has upheld the admission of confessions made by defendants suffering from mental impairments, including mental retardation. *See Bell v. State*, 582 SW.2d 800, 809 (Tex. Crim. App. 1979)(defendant was mildly

mentally retarded and lacked capacity to read and understand certain statements); *Casias v. State*, 452 S.W.2d 483, 488 (Tex. Crim. App. 1970)(defendant was illiterate with a second grade level education and an IQ o f68).

Additionally, to the extent that the applicant argues that he has low intellectual functioning, the applicant cannot now urge that his execution is barred under *Atkins v. Virginia,* 536 U.S. 304 (2002). First, the applicant has bypassed the opportunity to raise mental retardation. [5] *See Ex parte Blue,* 230 S.W.3d 151, 154 (Tex. Crim. App. 2007)(holding that constitutional prohibition against executing mentally retarded person does not mean that such claim can be made "at any time;" the Legislature may exercise its "regulatory authority to impose limitations on successive and abusive state post-conviction writs").

Moreover, given the applicant's IQ testing results, the applicant cannot satisfy even the first prong criteria for mental retardation, significantly subaverage general intellectual functioning, much less the adaptive

---

[5] In *Hall v. Florida,* __ U.S. __, 134 S. Ct. 1986, 1990 (May 27, 2014), the United States Supreme Court replaced the term "mental retardation" with "intellectual disability" in its opinion. Because the applicant's claims and the Court's ensuing orders predate *Hall* and use the term "mental retardation," the State will refer to mental retardation unless discussing an opinion where the term "intellectual disability" is used.

functioning and early onset prongs. *Ex parte Briseno,* 135 S.W.3d 1, 7 (TEX. Crim. App. 2004)(to establish mental retardation, defendant must prove by a preponderance of the evidence that he meets all three prongs of the three-prong test of mental retardation: (1) significantly subaverage general intellectual functioning; (2) that is concurrent with deficits in adaptive behavior; (3) and, originates during the developmental period); *see also* TEX. HEALTH & SAFETY CODE, § 591.003 (13).

Based on the foregoing, the applicant fails to meet the requirements of TEX. CODE CRIM. PROC. art. 11.071, § 5. In the alternative, and notwithstanding the applicant's failure to meet the statutory requirements of art. 11071, § 5 for the filing of a subsequent application for writ of habeas corpus, the applicant's claims are meritless.

## IV. CONCLUSION

WHEREFORE, PREMISES CONSIDERED, the Respondent respectfully requests that the Court of Criminal Appeals dismiss the applicant's instant original application for writ of habeas corpus and/or deny the applicant habeas relief as well as deny the applicant's request for stay of execution.

Respectfully submitted,


/s/LYNN HARDAWAY
LYNN HARDAWAY
Assistant District Attorney
Harris County, Texas
1201 Franklin, Suite 600
Houston, Texas  77002
(713) 755-6657
(713) 755-5240 fax
TBC 08948520
Hardaway_Lynn@dao.hctx.net

## V. CERTIFICATE OF SERVICE AND COMPLIANCE

Service has been accomplished by sending a copy of this instrument by mail to counsel for the applicant on this the 12th day of January, 2015.

Pat McCann
Attorney at Law
909 Texas Ave. #205
Houston, Texas  77007
713 223-3805
713 226-8097 fax
writlawyer@justice.com

Pursuant to TEX. R. APP. P. § 9.4, I certify that the instant document contains 5,155 words.

Respectfully submitted,


/s/LYNN HARDAWAY
LYNN HARDAWAY
Assistant District Attorney
Harris County, Texas
1201 Franklin, Suite 600
Houston, Texas  77002
(713) 755-6657
(713) 755-5240 fax
TBC 08948520
Hardaway_Lynn@dao.hctx.net